Veronica H. PETERS, et. al., Plaintiffs,

v.

The CITY OF BILOXI, MISSISSIPPI, Warren Newman, Individually, The City of Meridian, Mississippi and John Does 1 thru 10, Defendant.

No. Civ.A. 498CV32LN.

United States District Court, S.D. Mississippi, Eastern Division.

April 13, 1999.

Bernard C. Jones, Jr., Law Offices of Bernard C. Jones, Jr., Jackson, MS, for plaintiffs.

Tere R. Steel, Page, Mannino, Peresich, Dickinson & McDermott, Biloxi, MS, William C. Hammack, Bourdeaux & Jones, Meridian, MS, for defendants.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, Chief Judge.

This cause is before the court on separate motions by defendants City of Biloxi and Warren Newman and by defendant City of Meridian for summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiffs have responded in opposition to both motions. The court, having considered the memoranda and attachments of the parties, concludes that defendants' motions are well taken and should be granted.

On October 28, 1993, Eugene Daniels was found dead in the bedroom of his Biloxi, Mississippi apartment, a victim of apparent gunshot wounds. The apartment was in disarray, and the bedroom in which Daniels' body was found appeared to have been ransacked. Among the items uncovered at the scene were a drinking straw with cocaine on it and a backpack which contained a pair of panties and a brassiere.

The Biloxi Police Department's (BPD) subsequent investigation of Daniels' death bore little fruit until September 27, 1996 when defendant Warren Newman, the BPD's lead investigator into the Daniels killing, interviewed Chris Fair, an inmate at the Harrison County Jail. Fair, who according to Newman had previously provided accurate and reliable information related to various crimes, claimed that he was present in a Biloxi motel room when a group of individuals who referred to themselves as "the crew" developed a plan to steal money and cocaine from Daniels. According to Fair, one of the members of "the crew" was a black female named "Veronica."[1]

Fair told Newman that Veronica and four other "crew" members went to Daniels' apartment and that he, along with crew member Kimberly Williams, stayed behind but met the other members of the group later that night at Henry Beck Park in Biloxi. According to Fair, it was at this meeting that he was provided with the following details of the robbery and murder which he in turn conveyed to Newman: "Veronica" knocked on the door, Daniels answered and the group rushed him; Daniels was then held at gunpoint while the group rummaged through the apartment looking for cocaine; Daniels was shot several times during the robbery and in the confusion, "Veronica" apparently left a book sack or bag in the apartment which contained a brassiere and panties. Fair told Newman that he did not know "Veronica's" last name but that she was also known as "chicken wing" or "chicken bird" and that she lived in an area of Gulfport, Mississippi known as "Sewer City."

Following his interview with Fair, Newman spoke the same day with the aforementioned Kimberly Williams who had also, according to Newman, provided accurate information about various drug crimes. Williams, echoing Fair's version of the events, advised Newman that she had been present in a Biloxi motel room when a group of individuals knows as "the crew" developed the plan to rob Daniels apartment. Williams, like Fair, stated that one of the members of the group was a black female named "Veronica." Williams told Newman that she did not go to Daniels' apartment but that she and Chris Fair met the group at Henry Beck Park where the group recounted the details of the crime, including the fact that "Veronica" had knocked on the door and that she had left a book bag in the apartment. Williams further advised that "Veronica" had lived in an area referred to as "Sewer City" and had a child by a man named "Poochie."

---

1. Fair was able to provide the first and last names of all of "the crew" members except for the black female, which he referred to simply as "Veronica."

Later that same day, Newman spoke with criminal investigators in the Gulfport Police Department and inquired as to whether they knew of a black female named "Veronica" who might go by the name of "chicken wing" or "chicken bird," live in "Sewer City" and have a child fathered by a man named "Poochie." One of the investigators indicated that he believed that he knew of an individual meeting that description, and after reviewing certain computer records, the investigator informed Newman that the individual was a twenty-seven year old female named Veronica Hinton.[2]

Next, Newman contacted the Mississippi Department of Public Safety and requested a copy of plaintiff Veronica Hinton's driver's license. After receiving plaintiff's driver's licence, Newman showed the photo to Chris Fair with the name concealed. According to Newman, when asked, "Do you know this person," Fair "look[ed] at it and immediately goes, that's the Veronica that was in the apartment."

With all of the above information at his disposal, Newman prepared an Underlying Facts and Circumstances memorandum (UFC), which he submitted along with an affidavit of Harrison County Prosecutor Bob Payne to Harrison County Court Judge Gaston Hewes in an effort to secure a warrant for the arrest of plaintiff and four other members of "the crew."[3] On October 1, 1996, after considering Newman's written submissions and sworn oral testimony concerning the Daniels investigation, Judge Hewes issued the warrant.

Having learned from the driver's licence that plaintiff's last known address was in Meridian, Mississippi, Newman telefaxed the arrest warrant to the Meridian Police Department (MPD) for execution. The matter was assigned to MPD detective Joel Walters who, after determining Veronica Hinton's exact residence, organized the arrest, which was carried out on October 1, 1996 at Veronica Hinton's home in the presence of her husband and two children. The next day, Newman and another member of the BPD transported plaintiff to Biloxi where she was questioned and photographed. After plaintiff continued to insist that she had had nothing to do with the killing, Newman returned to Chris Fair and presented him with a photo lineup which included the picture of plaintiff taken at the Biloxi station. Fair could not identify any of those pictured as the "Veronica" from the motel room but maintained that the driver's license photo did depict the individual who went to Daniels' apartment on the night of the killing.

Thereafter, Newman consulted with the county prosecutor and concluded that plaintiff should be released and at plaintiff's request, Newman drove her to her inlaws' house in Poplarville, Mississippi. It was later determined that the real "Veronica" involved in the crime was Veronica Johnson, who has pled guilty to armed robbery.

---

2. Plaintiff's name at the time was Veronica Hinton. She married plaintiff John C. Peters on January 1, 1997.

3. The UFC stated, in part:
On 27 September, 1996, Sergeant Warren Newman spoke with an individual [Chris Fair] at the Harrison County Jail. The individual advised Newman about the murder of Eugene Daniels.... They advised that [certain named individuals] and a black female named Veronica planned to rip off Eugene Daniels for a kilo of cocaine.... The individual also told Newman that Veronica left a bag at Daniels apartment which contained a pair of panties and a bra....

On 27 September, 1996, Sergeant Warren Newman and Lieutenant Darrin Peterson interviewed a reliable source [Kimberly Williams] who corroborated the information given by the individual interviewed earlier that day. Sergeant Newman reviewed the investigative report done by the crime scene analyst and read that ... a green back pack containing a ... pair of blue bikini panties ... were retrieved from the apartment.... On 30 September, 1996, Newman again spoke with the cooperating individual. They identified the black female known as Veronica as Veronica Hinton of Gulfport, Mississippi.

On December 31, 1997, plaintiff Veronica Hinton Peters and her husband filed this § 1983 action on their own behalf and on behalf of their two children against officer Warren Newman, the City of Biloxi, the City of Meridian and John Does 1 thru 10.[4] In their complaint, plaintiffs allege violations of both the federal and state constitutions as well as various other state law claims. Defendants have moved for summary judgment contending that plaintiffs' claims are deficient as a matter of law. The court will consider the arguments of each defendant in turn.[5]

Plaintiffs allege that officer Newman violated their constitutional rights, first, by securing an arrest warrant without probable cause. Specifically, they assert that "Newman knew or should have known that the underlying facts and circumstances and affidavit failed to establish probable cause" but that he secured the warrant "on the basis of false statements and/or misleading omissions made to the magistrate."

■ "The first inquiry in any section 1983 suit is whether the plaintiff has been deprived of a right secured by the Constitution and laws." *Baker v. McCollan*, 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433, 439 (1979). Where no such deprivation has occurred, the court need not address the issue of whether the defendant is somehow entitled to an official immunity. *Garris v. Rowland*, 678 F.2d 1264, 1270 (1982).[6]

■ In answering this "first inquiry" in the instant case, it is the Fourth and Fourteenth Amendments which guard against arrest without probable cause. *Thomas v. Sams*, 734 F.2d 185 (5th Cir. 1984). However, the constitution does not guarantee that only the guilty will be arrested. *Smith v. Gonzales*, 670 F.2d 522, 526 (5th Cir.1982). Where an arrest is made under authority of a properly issued warrant, the arrest is simply not a false arrest. *Id.* Such an arrest is not unconstitutional, and a complaint based on such an arrest is subject to dismissal for failure to state a claim. *Id.* Even if an officer acts with malice in procuring a warrant, if the facts supporting an arrest are put before an intermediary such as a magistrate, the determination of probable cause by the magistrate and his independent decision to issue a warrant breaks the causal chain leading to any constitutional violation. *Id.*

■ However, "the mere presentation of the warrant application to the magistrate does not automatically relieve the individual officer[ ] from liability." *Hightower v. Schaubhut*, Civ.A. No. 89–3243, 1990 WL 58129, at *3 (E.D.La.1990). The chain is broken "only where all the facts are presented to the [magistrate], where the malicious motive of the law enforcement officials does not lead them to withhold any relevant information." *Hand v. Gary*, 838 F.2d 1420, 1428 (5th Cir.1988). Said another way, "[a]ny misdirection of the magistrate ... by omission or commission" will serve to "taint" the deliberations

---

**4.** According to the complaint, the John Doe defendants are Meridian police officers. Plaintiffs concede that they were unable to determine the identity of these defendants prior to the expiration of the time for amending the pleadings. As such, the liability, if any, of these unnamed Meridian officers is a question not presently before the court.

**5.** The court should point out at this juncture that plaintiffs contend in their responses to the motions that the failure of the City of Biloxi and Newman to comply with discovery requirements "precludes summary judgment" because the failure to produce the discoverable materials "has obviously prevented the full development of the plaintiffs' claims."

Plaintiffs filed a motion to compel these "discoverable materials," and the motion was denied by the magistrate as being untimely. The court has reviewed plaintiffs' objection to the magistrate's order, along with defendants' response, and concludes that the order was not clearly erroneous or contrary to law. *See* Fed.R.Civ.P. 72(a). As such, the court will determine whether plaintiffs' claims survive summary judgment by considering the evidence currently in the record.

**6.** In light of this analytical ordering, the court need not address defendant Newman's argument that he is entitled to qualified immunity.

of the independent intermediary and keep the chain of causation in tact. *Id.; see also Taylor v. City of Nederland,* 685 F.Supp. 616, 617 (E.D.Tex.1988) (stating that the causation approach is a means of deciding § 1983 claims when the law enforcement officials "disclosed all pertinent facts to the magistrate").[7]

 Plaintiffs concede that "it is decisive [for the purposes of the unlawful arrest claim] whether Veronica Hinton Peters was arrested under the authority of a properly issued arrest warrant." However, they contend that the warrant was not properly issued because "Newman intentionally mislead the Court with respect to the identification of Veronica Hinton Peters by Chris Fair and omitted certain information which was material to the probable cause determination." Specifically plaintiffs assert that Newman failed to advise the magistrate by way of the UFC

or otherwise that Chris Fair was the *only* person to identify Veronica Peters and that the UFC was misleading insofar as it indicated that more than one person identified the driver's licence photo as "Veronica."[8] In addition, plaintiffs contend that the UFC was misleading in that it indicated that the informant identified the suspect by her first and last name. According to plaintiffs, "it is clear that if the judge had been made aware of the tenuous nature of Fair's identification the warrant would not have been issued . . . for lack of probable cause."[9]

 Plaintiffs' allegation that Judge Hewes was not advised that the identification was made by a single individual and that he was somehow misled in this regard by the UFC is simply not borne out by the facts. While it is true that Newman at times incorrectly used the pronoun "they" when referring to Chris Fair,[10] and it is

---

7. One federal court in this circuit has questioned the validity of the chain of causation approach in light of the Supreme court's decision in *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 1095–98, 89 L.Ed.2d 271 (1986). In *Hamrick v. City of Eustace*, 732 F.Supp. 1390, 1396 (E.D.Tex.1990), the court followed its statement of the *Smith v. Gonzales* causation rule by opining, "However, after the Fifth Circuit's decision in *Smith*, the Supreme Court held that an officer who initiates the procurement of a warrant *is not necessarily* shielded from liability merely by the issuance of a warrant." The court went on to state, "As for the specific theory that the intermediary's decision to issue a warrant breaks the causal chain, the Supreme Court has specifically held that such a theory is inconsistent with their interpretation of section 1983." *Id.*

 In a footnote, *Hamrick* recognized that the Fifth Circuit had expressly reaffirmed the chain of causation two years after *Malley* in *Hand v. Gary, supra*—a case in which the Fifth Circuit did not even cite *Malley. Id.* at n. 3. The *Hamrick* court queried why the Fifth Circuit failed to address the "apparent conflict between the two cases" and stated that "it is quite possible that the Fifth Circuit concluded that *Malley* was . . . somehow distinguishable." *Id.* A close review of the case law in this area reveals that the principles enunciated in *Malley* are in fact inapplicable to cases which have turned on an application of the causation rule. *Malley* set forth a qual-

ified immunity test in the context of an allegation by a plaintiff that he had been arrested on a warrant unsupported by probable cause. *Malley*, 475 U.S. at 341, 106 S.Ct. 1092. On the other hand, as already pointed out, if the chain of causation is broken by a probable cause determination by an independent magistrate, the court never reaches the qualified immunity issue. *Garris, supra.*

8. Plaintiffs point to the portion of the UFC which states that "[o]n 30 September, 1996, Newman again spoke with the individual [Fair]. *They* identified the black female known as Veronica as Veronica Hinton of Gulfport, Mississippi" (emphasis supplied by plaintiffs).

9. Plaintiffs also apparently take the position that the warrant was defective because Newman employed an "overly suggestive" "one photo lineup" when he used Veronica Peters' driver's license to gain an identification by Chris Fair. However, as defendants correctly point out, the prohibition against the use of overly suggestive identification methods does not apply to a police officer's marshaling of information in anticipation of swearing out an arrest warrant. *See Mundy v. Georgia*, 586 F.2d 507, 508 (5th Cir.1978).

10. Defendants characterize this use of the pronoun "they" as a "mere grammatical error" which plaintiffs are attempting to "turn into a constitutional claim."

also true that the UFC does not specifically point out that the identification was from a driver's licence, any confusion created in this regard was clarified by Newman's sworn oral testimony before Judge Hewes in the warrant application process.[11] Newman testified in his deposition that he specifically told Judge Hewes that the only identification that he had was from one person who looked at a driver's licence.

In addition, it is clear that whatever confusion was created by the unartfully drafted UFC with respect to Fair's knowledge of plaintiff's last name was likewise clarified by Newman's oral testimony when applying for the warrant. When asked if he told the judge that Chris Fair did not know Veronica's last name, Newman responded, "Yes. I told him that. Yes. I told him he knew Veronica as Veronica and nothing more, and then picked her out of a driver's license photo."

After reviewing the UFC, as supplemented by Newman's deposition testimony, the court concludes that plaintiff has failed to demonstrate a triable issue of fact as to whether Newman withheld relevant information or misdirected the magistrate by misstating or omitting relevant facts. Since the record indicates that all of the pertinent facts were presented to the magistrate, it follows that his deliberations were untainted and, as a result, his independent determination of probable cause broke the chain of causation and insulates Newman from liability for plaintiff's arrest. The arrest was made under the authority of a properly issued warrant and, therefore, summary judgment will be granted with respect to this aspect of plaintiffs' case.

Next, plaintiffs allege that defendant Newman used excessive force by transporting Veronica Peters from Meridian to Biloxi "handcuffed and shackled." Plaintiffs contend that Newman used unreasonable and unjustified force because "there was no indication that she [Veronica Peters] presented any danger or flight risk that justified what amounts to a physical assault." In addition, they assert that "during the trip to Biloxi, Newman subjected Ms. Peters to verbal abuse and harassment which was tantamount to a mental assault...."[12]

 Claims involving the use of excessive force related to an unincarcerated suspect are based upon an alleged violation of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 388, 109 S.Ct. 1865, 1867–68, 104 L.Ed.2d 443 (1989). In order to sustain a cause of action for use of

---

**11.** A court may consider an affiant's oral testimony, extrinsic to the written affidavit, which is sworn before the issuing magistrate, in determining whether the warrant was founded on probable cause. *United States v. Hill*, 500 F.2d 315, 320 (5th Cir.1974). The Fourth Amendment requires only that the judicial officer issuing a warrant be supplied sufficient information, under oath or affirmation, which would support an independent judgment that probable cause exists for the warrant's issuance. *Id.* at 320–21; *see also Petti v. Mississippi*, 666 So.2d 754, 757 (Miss.1995) (written affidavit supplemented by oral testimony of police officers can, as combined, establish substantial basis for magistrate's determination that probable cause existed for issuance of warrant). In *Petti*, the court considered the officer's oral testimony given to the issuing magistrate as recounted by the officer at the subsequent suppression hearing in determining whether probable cause exist-

ed to support issuance of a search warrant. *Id.* at 759.

**12.** Plaintiffs make two additional arguments in support of their excessive force claim. They contend that Newman used excessive force against Veronica Peters "because her arrest itself was unlawful." In addition, they allege that Newman should be liable for excessive force because "but for the acts and omissions of Newman in securing the invalid arrest warrant there would nave been no arrest ... by the Meridian officers who clearly did use excessive force." Plaintiffs cite no authority, and the court is aware of none, in support of these particular excessive force theories. In any event, these arguments are of no avail to plaintiffs since they are both premised on an unlawful arrest, and the court has already determined that plaintiffs have not demonstrated a triable issue in that respect.

excessive force, the evidence must establish that the use of force was "objectively unreasonable." *Id.* The Fifth Circuit has established a three-part test for § 1983 excessive force claims. To prevail on such a claim, a plaintiff must show: (1) an injury (2) which resulted directly and only from a use of force that was clearly excessive to the need and (3) the excessiveness of which was objectively unreasonable. *See Fontenot v. Cormier*, 56 F.3d 669, 674 (5th Cir.1995).

Defendants do not contend that plaintiffs have failed to satisfy the "injury" requirement for an excessive force claim. Therefore, the question is whether the amount of force used was "clearly excessive" and "objectively unreasonable." The Supreme Court has provided the proper standard for this inquiry:

■ The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the $^{20}\!/_{20}$ vision of hindsight.... Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment.... [T]he "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *Graham*, 490 U.S. at 396, 109 S.Ct. at 1872. In answering the question of whether the force was "clearly excessive" and "objectively unreasonable," the court considers the totality of the circumstances. *Id.* While force may be expressed by means other than physical contact, the absence of physical injury is a factor that may signify that the force was not excessive, and it should be considered with the totality of other circumstances. *Petta v. Rivera*, 143 F.3d 895, 901 (5th Cir.1998).

■ In the case at bar, plaintiffs do not contend that officer Newman hit or otherwise physically injured Veronica Peters. Rather, they allege that she was handcuffed, shackled and verbally harassed.[13] Plaintiffs have cited no authority, and the court has uncovered none, in this circuit or any other holding that the conduct of which plaintiffs complain is actionable under § 1983. In fact, numerous courts have opined that plaintiffs alleging nothing more than being handcuffed and verbally abused had failed to state a valid claim of excessive force under § 1983.[14] As the court stated in *Owens, supra*, "[p]laintiff asks this court to transform the constitutional wrong of excessive force in arrest into the common law tort of battery[,] [assault or infliction of emotional

13. The "verbal harassment" apparently consisted of statements allegedly made to Veronica Peters during the drive from Meridian to Biloxi. She claims that she was told that she could get the death penalty for her crime and that if she loved her children she should go ahead and tell them about this possibility.

14. *See Thompson v. City of Galveston*, 979 F.Supp. 504, 509 (S.D.Tex.1997), where the court held that a plaintiff had failed to state an actionable excessive force claim where he merely alleged that he had been handcuffed, thrown to the floor and threatened. *Thompson* noted that only where there were "dramatic facts" such as holding a gun to a plaintiff's head and threatening to pull the trigger had excessive force claims based solely on verbal abuse been upheld by the courts. *See also Owens v. Colburn*, 860 F.Supp. 966, 972 (N.D.N.Y.1994) (holding that an officer's application of handcuffs and the allegations of pain that resulted did not rise to the level of a constitutional violation, especially given the absence of visible injuries, complaints or requests for medical treatment); *Soares v. Connecticut*, 8 F.3d 917, 922 (2d Cir.1993) ("Neither the Supreme Court nor the Second Circuit has established that a person has the right not to be handcuffed in the course of a particular arrest, even if he does not resist or attempt to flee."); *Duggan v. City of League City, Texas*, 975 F.Supp. 968, 971–72 (S.D.Tex.1997) ("The Fifth Circuit has yet to award damages for psychological injuries alone. This Court will not do so now."); *Henning v. Sowders*, 19 F.3d 1433 (6th Cir. 1994) ("Mere verbal abuse ... is insufficient to establish a constitutional deprivation under § 1983.").

distress]; [which] would reduce the holding in *Graham* into an empty proposition against which no use of force is reasonable as a matter of law." *Owens*, 860 F.Supp. at 973. In light of the above principles, no reasonable juror could conclude that under the totality of the circumstances, Newman's actions were objectively unreasonable and clearly excessive.[15] Summary judgment will therefore be granted with respect to plaintiffs' excessive force claim against Newman.

Turning now to plaintiffs' claim against the City of Biloxi, they allege in the complaint that "the City of Biloxi developed and maintained policies or customs exhibiting deliberate indifference to the constitutional rights of persons in the State of Mississippi ... which caused the violation of plaintiffs' rights." Defendants argue, in support of their motion, that plaintiffs cannot satisfy the requirements of municipal liability to hold a governmental entity liable under § 1983.[16]

In response to the motion, plaintiffs essentially concede that they have failed to demonstrate a genuine issue of material fact with respect to the municipal liability of the City of Biloxi. They state that "[b]ecause of Biloxi and Newman's failure to cooperate with discovery, plaintiffs are not able to respond with much specificity concerning the liability of Biloxi...." Plaintiffs further assert that "*if* the defendants Biloxi and Newman are required ... to properly make disclosures and properly respond to discovery, plaintiffs will be able

to make the requisite showing ..." (emphasis added).

As discussed *supra,* plaintiffs filed a motion to compel which was denied by the magistrate. Since the court has already determined that this denial should be affirmed, defendants will not be required to produce further materials. As plaintiffs have taken the position that they need these materials to meet their summary judgment burden with respect to the municipal liability of the City of Biloxi, the magistrate's order is effectively dispositive of this claim, and Biloxi will be granted summary judgment.[17]

Plaintiffs' remaining allegations are lodged against the City of Meridian. Specifically, they assert that by inadequately training and supervising its officers, the City "developed and maintained policies or customs exhibiting deliberate indifference to ... constitutional rights...." The City of Meridian seeks summary judgment contending that plaintiffs cannot meet the threshold requirements for municipal liability under § 1983.

In *Monell v. New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the United States Supreme Court held that a local government may not be held liable under respondeat superior for constitutional torts committed by municipal employees. Instead, "[i]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whole edicts or acts which may fairly be said to represent official policy, inflicts

---

**15.** The court would reemphasize the point stated in *Petta, supra,* which is directly applicable to the instant case—that the absence of physical injury is a factor that may signify that the force was not excessive.

**16.** These requirements will be discussed in more detail when the court addresses the liability of the City of Meridian, *infra.*

**17.** Plaintiffs make a single unsupported assertion that "plaintiffs believe ... that the record reflects a failure on the part of Biloxi to properly train and supervise Newman concerning murder investigations." Rule 56(e)

requires the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." The court is not obliged to "sift through the record in search of evidence to support a party's opposition to summary judgment." *Doddy v. Oxy USA, Inc.,* 101 F.3d 448, 463 (5th Cir.1996). Plaintiffs' summary and conclusory allegation with respect to what they "believe" the record reflects is insufficient to create a genuine issue of material fact. *See Hibernia Nat'l Bank v. Carner,* 997 F.2d 94, 95 (5th Cir.1993) ("[A] summary assertion ... is not enough evidence to raise a genuine issue of material fact.").

the injury that the government as an entity is responsible under § 1983." *Id.* at 694, 98 S.Ct. 2018. On the other hand, the governmental employer is not liable under § 1983 merely because a non-policy-making local governmental employee acts in a manner inconsistent with established governmental policy. *See City of St. Louis v. Praprotnik,* 485 U.S. 112, 121–22, 108 S.Ct. 915, 923, 99 L.Ed.2d 107 (1988).

■ Two basic configurations can lead to a municipality's liability under § 1983 for the acts of its officials. *Turner v. Upton County, Tex.,* 915 F.2d 133, 136 (5th Cir.1990). First, a municipality is held "effectively to have made policy or condoned the creation of a custom by ratifying the unconstitutional or illegal actions of subordinate officers or employees." *Id.* Second, the municipality may be held liable for the illegal or unconstitutional actions of its "final policymakers" themselves as they engage in the setting of goals and the determination of how those goals will be achieved. *Id.* In the case *sub judice,* plaintiffs' allegations implicate both of these "configurations" of § 1983 liability and will be separately addressed.

With respect to the former avenue of municipal liability, the Fifth Circuit has recently discussed the "fundamental requirements" for holding a city liable under § 1983 for maintaining an alleged "custom or policy" of inadequate training and supervision. *See Snyder v. Trepagnier,* 142 F.3d 791 (5th Cir.1998). Characterizing the critical elements as "culpability and causation," *Snyder* stated that the Supreme Court has established a two-prong test for satisfying these elements: First, the municipality must have consciously enacted a policy reflecting "deliberate indifference" to the constitutional rights of its citizens; second, the municipality must be the "moving force" behind the constitutional violation. *Id.* at 795–96.

*Snyder* next emphasized that municipal liability for inadequate training and supervision imposes on the plaintiff an extremely heavy burden.

[Plaintiffs must] establish both the causal link ("moving force") and the city's degree of culpability ("deliberate indifference" to federally protected rights). *These requirements must not be diluted,* for "[w]here a court fails to adhere to *rigorous requirements of culpability and causation,* municipal liability collapses into respondeat superior liability." (Citation omitted.) Accordingly, we have demanded a *high standard of proof* before imposing ... liability on a municipality.... [M]ere negligence [falls] short of the "deliberate indifference" standard ...; plaintiffs must offer evidence of not simply a decision, but a "decision by the city itself to violate the Constitution" (emphasis added) (citation omitted).

*Id.* at 796.

*Snyder* cited *City of Canton v. Harris* in which the Supreme Court first stated that only "in limited circumstances" can a municipality be held liable for a failure to train its police officers. *Id.* at 795 (citing *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). The court then emphasized that "proof of a single violent incident ordinarily is insufficient to hold a municipality liable for inadequate training" and that the plaintiff must demonstrate " 'at least a pattern of similar incidents in which the citizens were injured ... to establish the official policy requisite to municipal liability.' " *Id.* (quoting *Rodriguez v. Avita,* 871 F.2d 552, 554–55 (5th Cir.1989)). The plaintiff must show that the failure to train or supervise reflects a "deliberate" or "conscious" choice by the city to endanger constitutional rights. *Id.*[18]

18. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983." *City of Canton,* 489 U.S. at 388–89, 109 S.Ct. 1197. The Fifth Circuit has described a "policy" by ratification as "[a] persistent, widespread practice by city offi-

■ In support of their failure to train/supervise claim against the City of Meridian, plaintiffs devote the initial pages of their brief to arguing that the Meridian police "decided to flex their muscles," "simply overreacted to the situation" and led an "armed invasion" into the Peters' home in the presence of their young children. According to plaintiffs, these "gestapo tactics," in addition to allegedly subjecting Veronica Peters to a "strip search in the presence of a male jailor," amounted to excessive and unreasonable conduct.

If plaintiffs take the position that this alleged conduct by individual police officers necessarily evinces inadequate training and/or supervision by the City of Meridian, their argument lacks merit. As already pointed out, a municipality may not be held liable under § 1983 solely because it employs a tortfeasor. Rather, plaintiffs must demonstrate that the injury was inflicted by a governmental policy or custom reflecting deliberate indifference.

Plaintiffs next point to the affidavit of Richard Dean, an attorney and assistant police chief in another city, and argue that his expert testimony establishes that "Meridian police officials deliberately ignored sound training principles which require that arrests be made when there will be the least amount of people to control." Again, however, Dean's testimony relates to the reasonableness of the conduct of the *individual officers* rather than the existence of an unconstitutional custom or policy. In any event, even if Dean's affidavit could be interpreted to mean that Meridian's training and supervision of its officers was inadequate, this alone would not allow plaintiffs to withstand summary judgment. *See Snyder*, 142 F.3d at 799 (holding that an expert's opinion is not alone sufficient to establish constitutional fault by a municipality where no facts support the inference that the city's motives were contrary to constitutional standards).

Plaintiffs further contend that Meridian's training policies are inadequate because the training does not specifically address the protection of the constitutional rights of arrestees and other persons not named in an arrest warrant. Specifically, plaintiffs assert that the failure of Meridian officials to adequately train and supervise its police officers "concerning the protection of the constitutional rights of its citizens when executing arrest warrants and its failure to implement a reasonable written policy regarding felony arrests manifests a deliberate indifference to the obvious consequence of a deprivation of constitutional rights."

In *City of Canton*, the Supreme Court stated that in light of the everyday duties assigned to particular officers, the need to provide training on certain constitutional limitations can be "so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers can reasonably be said to have been deliberately indifferent...." *City of Canton*, 489 U.S. at 390, 109 S.Ct. 1197. While the court would agree that the duty to execute arrest warrants in a constitutional manner would appear to be one of those duties which "obviously" deserves training, plaintiffs have offered no evidence indicating that Meridian officers are *not* trained in this regard.[19] They simply make the unsupported assertion quoted above and argue that *defendant* has failed to proffer evidence that it trains its officers in these specific areas. It is of course plaintiffs' burden to set forth the evidentiary basis for a triable issue, and they have failed to do so with respect to any lack of

---

cials or employees which ... is so common and well settled as to constitute a custom that fairly represents municipal policy." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir.1984).

**19.** On the other hand, defendant proffered the training file of Officer Walters, who was in charge of the arrest, and the file indicates that he underwent training for "Basic Law Enforcement," "The Standard of Care for Police Officers, Criminal Investigation" and "Arrest Unarrest."

training in the area of execution of arrest warrants.

Plaintiffs' final argument regarding an alleged unconstitutional custom or policy by way of municipal ratification is that "Meridian has been put on notice that its training program is deficient" due to the fact that "[s]ince February 1993 Meridian police have been involved in at least twelve lawsuits alleging assault, false arrest or brutality." Being continuously named as a defendant in lawsuits of this nature, according to plaintiffs, illustrates "Meridian's continued adherence to an approach it knows or should know has failed to prevent constitutional violations by its police officers" and the "deliberate indifference necessary to trigger municipal liability."

■ The mere fact that other lawsuits have been filed against the City of Meridian does not provide a basis for municipal liability. *See Singleton v. City of Newburgh,* 1 F.Supp.2d 306, 311 (S.D.N.Y. 1998); *see also Mendoza v. City of Rome,* 872 F.Supp. 1110, 1118 (N.D.N.Y.1994) ("claims ... filed against the City, standing alone, do[ ] not establish a pattern, policy, or practice which [is] causally related to the use of excessive force upon the plaintiff"). The complaints do no more than suggest that the City was on notice of various civil rights abuses that had been alleged. *Singleton,* 1 F.Supp.2d at 312. Absent additional evidence that Meridian's efforts to evaluate the claims "were so superficial as to suggest that its official attitude was one of indifference to the truth of the claim," *Fiacco v. City of Rens-*

*selaer, New York,* 783 F.2d 319, 328 (2d Cir.1986), plaintiffs cannot survive summary judgment simply with evidence of prior lawsuits.[20]

In sum, plaintiffs have presented evidence of a single incident, one expert opinion that Meridian's training is inadequate, an unsupported assertion that Meridian does not train its officers in the area of executing arrest warrants and a list of lawsuits which have been filed against the City over the past five years. The court concludes that this evidence is insufficient to create a triable issue with regard to municipal liability. In light of the totality of the evidence, no reasonable juror could conclude that Meridian's training and/or supervision policies were "so obvious and so likely to result in the violation of constitutional rights" that the City can be said to have been "deliberately indifferent." *See Snyder,* 142 F.3d at 799.[21]

As an alternative basis for municipal liability, plaintiffs contend that the decision to employ what they allege was excessive force in this case "was made by 'authorized decisionmakers' directed by the City of Meridian." In support of their position, plaintiffs cite *Board of County Commissioners of Bryan County, Oklahoma v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 1389, 137 L.Ed.2d 626 (1997), in which the Supreme Court recognized that "proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably." As such, plain-

---

**20.** In *Fiacco,* a case in which the city was sued under § 1983 for negligently supervising its officers in their use of force, the court stated that "evidence that a number of claims of police brutality had been made by other persons against the City, *together with evidence as to the City's treatment of these claims,* was relevant." *Fiacco,* 783 F.2d at 328 (emphasis added). The court went on to opine that the city's knowledge of these allegations "and the nature and extent of its efforts to investigate and record the claims" were pertinent to the plaintiff's contention "that the City had a policy of nonsupervision of its police-

men that reflected a deliberate indifference to their use of excessive force." *Id.*

**21.** Since plaintiffs have failed to create a genuine issue with respect to whether the City of Meridian enacted a training and/or supervision policy reflecting deliberate indifference, the court need not address the question of causation—whether there is a direct causal link between the alleged policy and the alleged constitutional violation so that the City could be said to be the "moving force" behind the violation.

tiffs apparently take the position that the City of Meridian may be liable under the second "configuration" of § 1983 liability—where a "final policymaker" of the city is himself responsible for the alleged injury.

A "policymaker" or "final decisionmaker" must be one who takes the place of the governing body in a designated area of city administration. *Webster*, 735 F.2d at 838.

> [T]he delegation of policymaking authority requires more than a showing of mere discretion or decisionmaking authority on the part of the delegee.... The governing body must expressly or impliedly acknowledge that the agent ... acts in lieu of the governing body to set goals and to structure and design the area of the delegated responsibility....

*Bennett v. Slidell*, 728 F.2d 762, 769 (5th Cir.1984). Identifying the situs of policymaking authority of a local governmental unit is a question of state law. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989).

In support of their claim that the decision to employ excessive force was made by "authorized decisionmakers" of the City of Meridian, plaintiffs cite the "Investigative Follow Up Report" of officer Walters wherein he indicated that he met with his "supervisors" and explained the situation before going forward with the arrest. It is apparently these "supervisors," including various lieutenants and sergeants in the MPD, whom plaintiffs contend are the "authorized decisionmakers" of the City of Meridian in the area of law enforcement.

To survive summary judgment, plaintiffs must establish that there is an issue of material fact as to whether policymaking authority has been delegated to the individuals with which Walters conferred prior to the arrest. However, there is nothing in the record indicating that Walters' supervisors are the policymakers for the department. There is no evidence that the governing body of Meridian, or anyone else for that matter, has expressly or impliedly acknowledged that these individuals act as an agent of the governing body in setting goals for and structuring the MPD. Absent evidence that these officers are "policymakers" or "authorized decisionmakers" for the City in the area of law enforcement, their decisions, directions or authorizations cannot saddle the City with liability under § 1983.[22]

In conclusion, plaintiffs have failed to create a genuine issue of material fact as to § 1983 municipal liability of the City of Biloxi and the City of Meridian, and they have likewise failed to create a triable issue regarding individual liability of Officer Newman under § 1983. As a result, defendants' motions for summary judgment are granted with respect to plaintiffs' federal claims, and the court declines to exercise its pendent jurisdiction over plaintiffs' state law claims.[23] A separate judgment will be entered in accordance with Federal Rule of Civil Procedure 58.

SO ORDERED.

---

**22.** It should be noted that under Mississippi law, the chief of police is the chief law enforcement officer of a municipality and has "control and supervision of all police officers employed by said municipality." Miss.Code Ann. § 21–21–1 (1990). Plaintiffs do not contend, and there is no evidence, that the Meridian Police Chief directed or authorized the specific procedures followed in arresting Veronica Peters.

**23.** When the federal claims are disposed of prior to trial, generally the court should decline to exercise pendent, or supplemental, jurisdiction. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); 28 U.S.C. § 1367(c)(3).