ESTATE OF Robert Cecil SMITH; Pauline Smith, Individually and as Administrator of Estate of Robert C. Smith; Dana Smith and Wanda Smith, Plaintiffs,

v.

Trooper James MARASCO, et al., Defendants.

No. CIV. 00–CV–5485.

United States District Court, E.D. Pennsylvania.

Jan. 11, 2002.

Jordan B. Yeager, Boockvar & Yeager, Bethlehem, PA, for plaintiffs.

Theodore E. Lorenz, Office of Atty. Gen., Philadelphai, PA, for defendants.

*OPINION AND ORDER*

VAN ANTWERPEN, District Judge.

## I. *INTRODUCTION*

Plaintiffs, the Estate of Robert C. Smith, Pauline Smith, Dana Smith and Wanda Smith, have brought this action pursuant to 42 U.S.C. § 1983. Plaintiffs allege that defendants violated Robert Smith's rights under the First, Fourth and Fourteenth Amendments of the United States Constitution. They have also brought a wrongful death claim, a claim for intentional infliction of emotional distress and a survival action under state law against all of the defendants.

Presently before this Court is Defendants' Renewed and Amended Motion for Summary Judgment on all claims, filed by Defendants on October 26, 2001. Defendants filed a prior motion for summary judgment, but we granted plaintiffs' request under Federal Rule of Civil Procedure 56(f) for more discovery. The issues are now back before us in the renewed and amended motion. Oral argument was held on December 13, 2001. We have jurisdiction over this matter pursuant to 28 U.S.C. § § 1331, 1343 and 1367.

## II. *STANDARD OF REVIEW*

The court shall render summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material"

only if it might affect the outcome of the suit under governing law. *Id.* at 248, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202. All inferences must be drawn, and all doubts resolved, in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.1985), *cert. denied,* 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985).

On motion for summary judgment, the moving party bears the initial burden of identifying those portions of the record that it believes demonstrate the absence of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To defeat summary judgment, the non-moving party must respond with facts of record that contradict the facts identified by the movant and may not rest on mere denials. *Id.* at 321 n. 3, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (quoting Fed.R.Civ.P. 56(e)); *see First Nat'l Bank of Pennsylvania v. Lincoln Nat'l Life Ins. Co.,* 824 F.2d 277, 282 (3d Cir. 1987). The non-moving party must demonstrate the existence of evidence that would support a jury finding in its favor. *See Anderson,* 477 U.S. at 248–49, 106 S.Ct. at 2505.

### III. *FACTUAL BACKGROUND*

#### A. *Introduction*

This case arises out of events that took place during the late hours of July 10, 1999 and the early hours of July 11, 1999, and during the week that followed. On July 10, 1999, at approximately 10:30 p.m., two Pennsylvania state police officers, Trooper James Marasco ("Marasco") and Trooper Nicholas Scianna ("Scianna") arrived at the residence of the decedent in this case, Robert Cecil Smith ("Smith"), to investigate a complaint lodged by Smith's neighbor, Michael J. Shafer ("Shafer"), against Smith.[1] (J. Marasco Dep. at 45, 60–64.)

#### B. *Previous Interactions Between Smith and Pennsylvania State Police*

Smith and several members of the Pennsylvania state police force had interacted on numerous occasions prior to July 10, 1999. Members of Troop L of the Pennsylvania state police had previously responded to complaints by Shafer and Smith against one another. (J. Marasco Dep. at 25–30.) Additionally, Smith had complained about misconduct by members of Troop L. Smith had, for example, filed a complaint with the state police against Corporal James Hamill ("Hamill"), a defendant named in the present case. (Penn. State Police Gen. Invest. Rep./IAD# 1999–543 at 11.) The state police thereafter charged Smith with making false reports to law enforcement, harassment by communication and harassment. (Crim. Compl. by Trooper E. Korvalski against Robert Smith, OT N:666498–0, Filed Jan. 24, 1992.) Smith had also filed another complaint with the state police, alleging that Weaver used excessive force in connection with an incident in October of 1998.[2] (Penn. State Police Gen. Invest. Rep./IAD# 1999–543 at 11.)

---

**1.** The substance of the complaint is unclear. One witness reported that Trooper Thomas Weaver ("Weaver") stated that the officers were there to investigate a complaint by Shafer that Smith had shot out Shafer's lights. (A. Achey Aff. at ¶ 11.) However, the written reports of Marasco and Scianna state that they were there to investigate a complaint that a light from Smith's property was shining on Shafer's property. (Penn. State Police Gen. Invest. Rep./IAD# 1999–543 at 5.)

**2.** Troop L members apparently knew that Smith had filed complaints against various members of the department.

Plaintiffs allege that through these interactions, defendants had knowledge of Smith's health conditions. According to plaintiffs, defendants knew that Smith had Post Traumatic Stress Disorder ("PTSD") resulting from his service as a Marine in Vietnam and that Smith had coronary disease. (Penn. State Police Gen. Invest. Rep./IAD# 1999–543 at 25; J. Marasco Dep. at 93, 103–05; E. Snyder Dep. at 74–75; T. Weaver Dep. at 60–62.) More specifically, they knew that Smith had undergone knee replacement surgery, suffered from hypertension, had recently been hospitalized, was required to be free from stressful situations and required medication. (M. Marcantino Dep. at 49; Snyder Dep. at 169; T. Weaver Dep. at 31.) Plaintiffs also allege that through these interactions, defendants discovered that Smith had a history of disagreements with Shafer, and that Smith believed that Shafer, a Caucasian individual, was prejudiced against Smith, an African–American individual. (G. Hall Dep. at 56; J. Marasco Dep. at 27–29.) Defendants, on the other hand, indicate that through these interactions, police learned that Smith possessed several weapons, had experience using them and was volatile. (J. Marasco Dep. at 102–03, 105.)

### C. Arrival at Smith Residence: July 10, 1999

Although it is unclear whether Marasco and Scianna were planning simply to talk to Smith or to issue a citation when they initially arrived at Smith's residence on July 10, 1999, it is clear that they attempted to make contact with Smith. (Penn. State Police Gen. Invest. Rep./IAD# 1999–543 at 2, 5; J. Marasco Dep. at 63, 73–74; M. Rodriguez Dep. at 36.) At this time,

they did not have an arrest warrant or a search warrant. (See generally Penn. State Police Gen. Invest. Rep./IAD# 1999–543.) No one answered when they knocked on the front door. (J. Marasco Dep. at 67–68.) They called the barracks and Corporal Mervin Rodriguez ("M. Rodriguez") advised them to have the residence telephoned and, if no one answered, to leave. (J. Marasco Dep. at 36; M. Rodriguez Dep. at 36.) No one answered the call placed by the barracks to the Smith residence. (J. Marasco Dep. at 80–82.) Marasco and Scianna did not leave, but went to the back of the house in search of Smith.[3] (J. Marasco Dep. at 82; N. Scianna Dep. at 42–43.)

At some point while in Smith's yard, Scianna observed a small red light, a dot, in a window of the house; initially, he thought that someone inside the residence was videotaping them and that the red light might be coming from the video camera. (J. Marasco Dep. at 82, 166; N. Scianna Dep. at 41–42.) Marasco then saw a small red light shine on Scianna's body. (J. Marasco Dep. at 82–84, 117–19; N. Scianna Dep. at 43.) Believing that Smith was directing the light at Scianna and thinking that it was the light from a laser sight attached to a firearm, the officers retreated and called for back-up assistance. (J. Marasco Dep. at 83; N. Scianna Dep. at 41–45.) Plaintiffs, on the other hand, highlight that defendants never saw a firearm or anything resembling a firearm and could not be sure what the source of the light was, or who was projecting the light. (F. Fetterolf Dep. at 72, 73; M. Rodriguez Dep. at 76–77; N. Scianna Dep. at 40; E. Snyder Dep. at 140; T. Weaver Dep. at 91, 149, 187–88; A. Wenger Dep. at 40, 46.) Plaintiffs also point to evidence

---

**3.** It is unclear whether Marasco and Scianna went to the back of the house while the barracks attempted to contact Smith, or if they proceeded around to the back after learning that no one answered the phone call.

suggesting that the light could have emanated from Shafer's property rather than from Smith's. (Marasco Dep. at 84.)

### C. Arrival of Back–Up Assistance and SERT Activation

Two other state police officers, M. Rodriguez and Trooper Thomas Rodriguez ("T. Rodriguez"), and local police officers initially responded to the call for assistance. (Penn. State Police Gen. Invest. Rep./IAD# 1999–543 at 6.) M. Rodriguez attempted to communicate with Smith over the public address system of his vehicle and tried to contact him by telephone, but was unsuccessful. (*Id.*) At some point, M. Rodriguez called Lieutenant Fetterolf ("Fetterolf") to request assistance from the state police's Special Emergency Response Team ("SERT"). (*Id.*) With Fetterolf's agreement, Corporal Hall ("Hall") of SERT was contacted. (*Id.*) Hall then contacted the Division Director of SERT, Captain Torkar ("Torkar"), and SERT was activated. (*Id.*)

Plaintiffs point out that Fetterolf made the decision to activate SERT even though he did not know from where the light was emanating or who was projecting the light, he did not have any indication that anyone had seen a weapon and he had not spoken to Marasco or Scianna. (F. Fetterolf Dep. at 30–31, 72, 113.) Plaintiffs also point to Hall's testimony that SERT should not have been activated unless the officers had or were in the process of preparing a warrant, or if there were exigent circumstances. (G. Hall Dep. at 39.) SERT was activated before the decision was made to obtain a warrant. (*See generally* Penn. State Police Gen. Invest. Rep./IAD# 1999–543.) And in the opinion of Hall, there were no exigent circumstances.[4] (*Id.* at 67.)

Before SERT arrived, Marasco, Scianna, M. Rodriguez, T. Rodriguez and several municipal officers began to establish a perimeter around the Smith residence. (Penn. State Police Gen. Invest. Rep./IAD# 1999–543 at 7.) At some point prior to SERT's arrival, M. Rodriguez and T. Rodriguez saw an individual, whom they believed to be Smith, walk from the residence to a shed in the backyard. (M. Rodriguez Dep. at 98–102.) The individual did not respond to their calls to him. Plaintiffs emphasize that defendants could not positively identify the individual as Smith. When SERT, which consisted of a negotiation team and a tactical team, arrived, Marasco, Scianna, M. Rodriguez, T. Rodriguez and the local officers were relieved; SERT members took over and set up a perimeter. (Penn. State Police Gen. Invest. Rep./IAD# 1999–543 at 7.) According to plaintiffs, at least thirty SERT members, wearing riot gear and armed with various weapons, were present. (E. Vail Aff. at ¶ 18, C. Zwicky Dep. at 42–43.) They cordoned off the area, such that no one, including Smith's family members, was allowed to approach or leave without the permission of the police. (E. Vail Aff. at ¶¶ 20, 21.) SERT attempted unsuccessfully to contact Smith. (*See generally* Penn. State Police Gen. Invest. Rep./IAD# 1999–543.)

### D. Execution of Warrants

In the early morning of July 11, 1999, Weaver, the on-duty criminal investigator who was called out to conduct an investigation, filed criminal charges against Smith. (Penn. State Police Gen. Invest. Rep./IAD# 1999–543 at 7.) The criminal complaint charged Smith with aggravated assault of Scianna, simple assault and

---

4. While this has evidentiary value, it is not dispositive of the legal ruling. We later make a review all of the facts indicating that there were exigent circumstances.

recklessly endangering a person. (*Id.* and Attachment 14, p. 23–24.) Plaintiffs stress that this decision was made despite the fact that no one had been able to positively identify Smith and that there was no evidence of a firearm.

At the same time, Trooper Andrew Wenger ("Wenger") obtained a search warrant for the Smith residence (*Id.*); the warrant authorized a search for "[a]ny and all firearms, including handguns, shotguns, rifles, or any combination thereof, including those equipped with 'laser-sights' or those capable of being equipped with such, as well as any instrument, device and/or object capable of projecting a laser-type beam visible to the naked eye." (Comm. of Penn., County of Berks App. for Search Warrant and Auth., Warrant Control # L01–0638117A, Dated July 11, 1999.) Plaintiffs argue that the application for the search warrant was made even though the officers lacked a basis for believing that the light emanated from Smith's property.

After the warrants were obtained, SERT entered and cleared the shed and the house, using rocks, distraction devices and tear gas. (Penn. State Police Gen. Invest. Rep./IAD# 1999–543 at 7.) Plaintiffs emphasize that the officers made this entry without having utilized means that were available to contact Smith. Specifically, the officers rejected offers from family members, friends and neighbors who requested to attempt to communicate with Smith. (Statement of D. Zwicky.) They did not record a message from anyone close to Smith, despite the availability of this technique. (G. Hall Dep. at 189–90.) They prevented a neighbor who was famil-

iar with the woods and was confident that he could find Smith, Chris Zwicky ("Zwicky"), from going into the woods. (C. Zwicky Dep. at 13–14, 25.) They did not utilize Smith's daughter, Dana Smith, despite the fact that she had received a call from Smith asking her to serve as a mediator between Smith and the police. (D. Smith Dep. at 22.) They also eliminated the possibility of using a psychologist. (Penn. State Police Gen. Invest. Rep./ IAD# 1999–543, Attachment 17, p. 2.)

The police did not find anyone in the shed or the house. (Penn. State Police Gen. Invest. Rep./IAD# 1999–543 at 7.) The officers did not locate a laser-sighted weapon, but did seize nine weapons, including several handguns with scopes. (*Id.* at 8.) During the search, Weaver rewound a video cassette that was in the Smiths' video camera and viewed the tape. (T. Weaver Dep. at 102–03.) At some point thereafter, a second warrant was obtained for a camcorder, its tape and answering machine cassette tapes; the police then seized answering machine cassette tapes.[5] (Penn. State Police Gen. Invest. Rep./IAD# 1999–543 at 8.) Inside Smith's house were his wallet, his identification, cash, credit cards, keys and the medication that he needed for his recent bypass surgery. (D. Smith Dep. at 68–69, 206.)

Members of SERT searched the wooded area adjacent to the Smith residence after learning that Smith had a hunting hideout in the woods. (Penn. State Police Gen. Invest. Rep./# 1999–543 at 8.) With Zwicky's assistance, SERT officers located

---

**5.** Plaintiffs argue that defendants refused to return the property seized from Smith's residence. When they did return the evidence, the tapes seized from the answering machine tapes did not contain any messages from law enforcement officers, despite the fact that the SERT log and the Affidavit of Probable Cause

in support of application for search warrant shows that defendants left several messages on Smith's machine. (Penn. State Police Gen. Invest. Rep./IAD# 1999–543, Attachment 14, p. 31, Attachment 18, p. 15; G. Hall Dep. at 66; M. Rodriguez Dep. at 60–61; A. Wenger Dep. at 101; R. Mathur Aff.)

the hideout from a state police helicopter used in the search. (*Id.*; C. Zwicky Dep. at 13, 16–18.) SERT never found Smith. (*See generally* Penn. State Police Gen. Invest. Rep./IAD# 1999–543.) Shortly after failing to find Smith at the hunting hideout, the officers called off the search.[6] (Penn. State Police Gen. Invest. Rep./IAD# 1999–543 at 8.) Around midday on July 11, 1999, the officers left the scene, stating that they had not been able to locate Smith to effect the arrest. (*Id.*) On Monday, July 12, 1999, the complaint against Smith was withdrawn pending further investigation. (*Id.*) Also on July 12, 1999, Smith's brother filed a missing persons declaration because Smith had not yet returned to his residence. (*Id.*)

### E. Events Following Morning of July 11, 1999

The parties' versions of the events that followed the morning of July 11, 1999 differ widely. Thus, we consider each of their versions in turn.

### 1. Defendants' Version of Events Following Morning of July 11, 1999

Defendants allege that the search effort continued past July 11, 1999 and involved numerous officers and search tactics. On July 14, 1999, Marasco and Corporal Elser ("Elser") conducted a foot search. (Penn. State Police Gen. Invest. Rep./IAD# 1999–543 at 8.) Elser also drove around the area looking for Smith. (*Id.*) Corporal Schell ("Schell") conducted an aerial search in a state police helicopter and interviewed neighbors. (*Id.*) Wenger inquired into Smith's cell phone records to determine if his cell phone had been used.[7]

(*Id.*) On July 15, 1999, Elser contacted the Lebanon Veterans Administration Hospital to see if Smith was there and on July 15, and 16, 1999, followed up on the inquiry into Smith's cell phone records. (*Id.*) On July 16, 1999, members of the state police searched the wooded area behind the Smith residence and several roads in the area. (*Id.* at 9.) Officers located Smith's cell phone during this search. (*Id.*) Officers describe the wooded area adjacent to the Smith residence as virtually impenetrable. (*Id.* at 19.)

### 2. Plaintiffs' Version of Events Following July 11, 1999

Plaintiffs allege that defendants did not make a concerted search effort on July 11, 1999 or in the week that followed. Plaintiffs point out that following the entry into the house and shed and the search of the woods, defendants did not act like Smith was a fugitive or a missing person; they did not conduct a house-to-house inquiry and did not conduct a sustained search; there was no effort that day to contact Smith's family members or friends, to check with local hospitals or to check houses or commercial establishments in the area. (Pls.' Opp. to Defs.' Renewed and Amended Mot. for Sum. Judg. at 19–20.) Plaintiffs note that defendants' search on July 14, 1999 lasted only thirty-five minutes and extended only 4 to 5 feet into the woods. (Penn. State Police Gen. Invest. Rep./IAD# 1999–543 at 8 and Attachment 5, p. 6.) Defendants did not use any maps, diagrams, photos, or a compass in their search on July 16, 2001. (W. Elser Dep. at 83; E. Snyder Dep. at 106, 109.) Smith's

---

**6.** It is unclear who was responsible for the decision to call off the search. (F. Fetterolf Dep. at 87; G. Hall Dep. at 81–82.)

**7:** Smith's cell phone records indicate that four outgoing calls were made on July 11,

1999 at 12:51 a.m., 1:03 a.m., 4:43 a.m. and 4:50 a.m. and that one incoming call was placed on July 11, 1999 at 11:45 a.m. (Bell Atlantic Cell Phone Records, Invoice # 0193917473, Dated July 12, 1999.)

family and friends, on the other hand, continued to search for him, and asked defendants to assist them; defendants denied their requests to use search dogs.[8] (D. Schools Dep. at 57–58; E. Snyder Dep. at 27–28, 165.) Tragically, on July 18, 1999, Smith's friend, Alan Achey ("Achey"), found Smith's partially decomposed body in the wooded area several yards from Smith's home. (A. Achey Aff. at ¶¶ 34–38.) Forensic pathologist Sanford Edberg estimated that Smith died in the woods behind his home sometime between 11:50 a.m. and 10:00 or 11:00 p.m. on Sunday July 11, 1999, and concluded that, given his medical background, the stress of the evening's events probably led to a fatal heart attack. (Dr. Edberg Rep. at 2–3.)

Plaintiffs point to evidence that they argue suggests that police located Smith's cell phone earlier than July 16, 1999 and his body earlier than July 18, 1999. They note that on July 11, 1999, police were in the part of the woods where Smith's body was found. (A. Achey Aff. at ¶ 41.) Witnesses stated that while the police were searching this part of the woods, the police helicopter hovered above this spot for an extended period of time. (Id.) Plaintiffs also indicate that the time of the morning when the police were at this location corresponds to the time that a call was received on Smith's cell phone. (Bell Atlantic Cell Phone Records, Invoice # 0193917473, Dated July 12, 1999; C. Brown Aff.) Plaintiffs note in addition that police used clippers to cut back the brush on the morning of July 11, 1999, and that signs of clipping were found within ten to fifteen yards of where Smith's body was ultimately found. (A. Achey Aff. at ¶ 42; G. Hall Dep. at 96–97.) Additionally, according to plaintiffs, on July 13, 1999, Weaver told Richard Smith, Smith's brother, that the police had already found Smith's cell phone (R. Smith Dep. at 43); given that police had not been at the scene since July 11, 1999, plaintiffs surmise that, contrary to defendants' assertion that they found Smith's cell phone during a search on July 16, 1999, defendants had actually found the phone by noontime on July 11, 1999.

## IV. DISCUSSION

### A. Discovery Issues

Plaintiffs have raised several discovery issues. We address each of the issues in turn.

#### 1. Rule 56(f) Motion

On November, 28, 2001, this Court denied plaintiffs' motion under Federal Rule of Civil Procedure 56(f) to take additional depositions and to extend discovery. This marked the second time plaintiffs sought more discovery time to respond to summary judgment under Rule 56(f). We explain the reasons for the denial herein.

▮ Federal Rule of Civil Procedure 56(f) provides that

> should it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained

---

**8.** Schools normally allowed his dogs to be used only when authorized by law enforcement. (D. Schools Aff.) When Schools told the state police on July 17, 1999 that he would only use his dogs if the request came from the state police, the state police indicated that they were not making that request. (E. Snyder Dep. at 27–28, 165.) Ultimately, the Smith family was able to get Schools's phone number from the state police; however, they were only able to get him to help in the search as an individual, and did not get the assistance of his dogs. (H. Smith Dep. at 84–85.)

or depositions to be taken or discovery to be had or may make such order as is just. Fed.R.Civ.P. 56(f).

The purpose of Rule 56(f), which provides relief to a party unable to respond to a motion for summary judgment because of insufficient opportunity for discovery, is "to prevent premature grants of summary judgment in cases where, given adequate time to obtain discoverable material from the movant, the party opposing the motion might be able to establish genuine issues of fact which would preclude summary judgment." *Temple Univ. v. Salla Brothers, Inc.*, 656 F.Supp. 97, 109–10 (E.D.Pa. 1986).

■ "The court must give a party opposing summary judgment an adequate opportunity to obtain discovery." *Radich v. Goode*, 886 F.2d 1391, 1393 (3d Cir. 1989). Here, plaintiffs have had sufficient opportunity to conduct discovery. On September 24, 2001, Magistrate Judge Rapoport ordered that plaintiffs choose ten individuals to depose. Plaintiffs did take those depositions. This Court has since denied plaintiffs' requests to take additional depositions because plaintiffs have failed to demonstrate a sufficient need for the additional depositions. On October 10, 1999, this Court denied plaintiffs' appeal from Magistrate Judge Rapoport's order denying plaintiffs' request to take more than ten depositions. This court noted in that order that plaintiffs' conduct had been dilatory and that no sufficient reason for taking the additional depositions was stated. On November 14, 2001, this Court again and for these same reasons denied a motion by plaintiff to take additional depositions and to extend discovery.

### 2. Additional Discovery Issues

On October 26, 2001, plaintiffs' counsel wrote a letter to Magistrate Judge Rapoport raising several discovery issues. Plaintiffs asserted in this letter that defendants had provided inadequate responses to various of plaintiffs' discovery requests, including plaintiffs' requests for admission, one document request and several interrogatories. Since it appeared that these issues had not been addressed specifically, we permitted the parties to argue these issues orally on December 13, 2001 despite our order of November 28, 2001 denying a discovery extension. Plaintiffs argued that defendants' discovery responses were incomplete, and that they would learn additional information that would preclude the issuance of summary judgment if further responses to these discovery requests were compelled and additional discovery permitted. Defendants argued that several of the discovery requests in question were overly burdensome and duplicative of discovery provided through deposition testimony and document production.

After hearing the parties argue these issues, we took under advisement in particular Plaintiffs' Interrogatory Number Two [9] and whether, as plaintiffs allege, defendants had provided inadequate discovery as to the substance of oral communications made by defendants to Smith from July 10, 1999 to July 16, 1999.[10] We con-

---

9. Interrogatory Two asks defendants to "Describe the substance of each oral utterance (e.g., statement, warning, command, etc.) that was communicated toward Mr. Smith at any time from July 10, 1999 to July 16, 1999, including but not limited [sic] all statements that were made over the police 'hailer', public address system, bull horn, voice and/or by telephone."

10. Defendants' response to Interrogatory Two was "Objection. Not only is this interrogatory unreasonable in its request, it is also duplicative and cumulative of discovery already elicited in this matter by way of depositions taken by Plaintiffs's counsel and by way of documents produced in this matter. Without waiving said objection, see the deposition testimony of the defendants deposed as well as

clude that there is no need for additional discovery. Plaintiffs have not shown that they would learn anything in addition to that which defendants have already provided through deposition testimony. Eight of the depositions taken by plaintiffs make mention of oral communications made by defendants to Smith. The two officers who initially appeared at Smith's residence in response to the complaint by Smith's neighbor, Marasco and Scianna, testified as to their communications with Smith, including statements made upon first approaching the house, telephone calls placed and messages made over the public address system; Marasco states that they called out Smith's name, identified themselves as state police officers and requested that he come out and speak with them. (J. Marasco Dep. at 72–73.) The state police officers who provided back-up assistance also testified as to similar communications made to Smith via the telephone and public address system, and to statements addressed to an individual, whom the officers assumed was Smith, seen moving from the house to the shed. (M. Rodriguez Dep. at 47, 59–61, 79–80, 108–09. 124.) Members of SERT also testified that they tried to hail Smith over the public address system and left messages on Smith's answering machine. (G. Hall Dep. at 59–60, 182, 198, 216.) Officers who participated in subsequent searches for Smith testified as to a prepared statement that was read over the public address system; this message stated that the Pennsylvania state police were looking for him, that his family was concerned about him and that he was not wanted for any crimes and asked him to show himself. (W. Elser Dep. at 78; E. Snyder Dep. at 102–03, 107.)

the documents already produced in this matter, including but not limited to the general

Given that plaintiffs have deposed the major players involved in the events of July 10–11, 1999 and of the week that followed and that eight of these individuals have testified in detail as to the timing and substance of their communications with Smith, we find that allowing more discovery would not reveal additional information that would alter our disposition of defendants' motion for summary judgment.

### vi. *Conclusion*

This case was filed on October 27, 2000 and discovery closed on October 26, 2001. *See* Pretrial Order Dated February 8, 2001 (ordering that all discovery be completed by October 26, 2001); *see also* Order Granting Plaintiffs' Rule 56(f) Motion Dated September 24, 2001 (granting motion to the extent that discovery would continue until October 26, 2001, denying it in all other respects and stating that "no further extensions of discovery will be permitted for any reason."). There has been ample time for discovery. Plaintiffs have in their last three motions for additional discovery and in oral arguments failed to set forth adequate reasons to extend discovery beyond this date; discovery is closed and defendants' motion for summary judgment may be decided.

### B. *42 U.S.C. § 1983*

42 U.S.C. § 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States. Section 1983 does not create any new substantive rights, but instead provides a remedy for the violation of a federal constitutional or statutory right. *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979);

investigation report and the documents attached thereto."

*Gruenke v. Seip,* 225 F.3d 290, 298 (3d Cir.2000). To state a claim under Section 1983, a plaintiff must show that the defendant, through conduct sanctioned under the color of state law, deprived him/her of a federal constitutional or statutory right. *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.E.2d 420 (1986); *Gruenke,* 225 F.3d at 298.

Plaintiffs allege violations of the Fourth, Fourteenth and First Amendments. As to the Fourth Amendment, plaintiffs allege that defendants violated the rights of the decedent, Robert Smith, when they used excessive force against him and when they engaged in malicious prosecution; plaintiffs also allege that defendants denied Smith and his relatives, Pauline Smith, Dana Smith and Wanda Smith, their right to be free from unreasonable searches and seizures. With respect to the Fourteenth Amendment, plaintiffs contend that defendants violated Smith's substantive due process rights, including his right to personal security and the right to be free from arbitrary government action that shocks the conscience, and his procedural due process rights, including the right to be free from abuse of process. Plaintiffs also allege that defendants violated Smith's Fourteenth Amendment right to equal protection. As to the First Amendment, plaintiffs assert that defendants violated Smith's right to speak out on matters of public concern and to be free from retalia-

tory government action. With respect to plaintiffs' Section 1983 claims, the brief in support of Defendants' Renewed and Amended Motion for Summary Judgment, filed on October 26, 2001, contends that defendants are entitled to summary judgment because plaintiffs have failed to establish any violation of a federal right and, in the alternative, because defendants are entitled to qualified immunity.

■ With respect to the Section 1983 claims raised against defendants in their individual capacities [11], defendants do not dispute that they, in responding to the complaint by Shafer against Smith, approaching the Smith residence, surrounding the Smith residence, obtaining an arrest warrant and a search warrant, entering the home and shed on Smith's property and searching Smith's property, acted under color of state law. Defendants do, however, argue that plaintiffs have not established the requisite elements of each of the constitutional claims. We address each of the constitutional claims in turn.

The first step in a Section 1983 case where qualified immunity is alleged is to ask whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conducted violated a constitutional right?" *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001).[12] If no

**11.** Plaintiffs do not specify whether they are suing defendant police officers in their official or individual capacities. We assume that plaintiffs are suing the officers in their personal capacities because a suit under Section 1983 against a municipal officer in his or her official capacity is, in actuality, a suit against the municipality that the officer represents; an official capacity suit is essentially treated as a suit against the entity itself. *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). *See also Ruiz v. Philadelphia Hous. Auth.,* No. CIV.A. 96–7853, 1998 WL 159038, at *6 (E.D.Pa. March 17,

1998); *Agresta v. City of Philadelphia,* 694 F.Supp. 117, 119 (E.D.Pa.1988); *Verde v. City of Philadelphia,* 862 F.Supp. 1329, 1336–37 (E.D.Pa.1994); *Baldi v. City of Philadelphia,* 609 F.Supp. 162, 168 (E.D.Pa.1985). Accordingly, the remainder of the Section 1983 discussion treats the Section 1983 claims as claims against the officers in their individual capacities.

**12.** *Saucier* considered the principles underlying the qualified immunity defense in a *Bivens* type action. The principles articulated in *Saucier* are applicable in Section 1983 cases,

constitutional right would have been violated were the allegations established, the inquiry ends; there is no need for further inquiry concerning qualified immunity. *Id.*

vii. *Section 1983 Claims Based on Fourth Amendment*

viii. *Excessive Force Claim*

ix. *Seizure of Smith*

 In order to state a claim for excessive force under the Fourth Amendment, a seizure or arrest must have occurred. "A 'seizure' triggering the Fourth Amendment's protections occurs only when government actors have, 'by means of physical force or show of authority, ... in some way restrained the liberty of a citizen.'" *Graham v. Connor,* 490 U.S. 386, 395 n. 10, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), *citing Terry v. Ohio,* 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and *Brower v. County of Inyo,* 489 U.S. 593, 596, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989). According to *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."

i. *Hodari*

Defendants rely on *California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) to argue that no seizure or arrest of Smith occurred. *Hodari* makes clear that the *Mendenhall* test is a necessary, but not sufficient, condition for seizure effected by a show of authority; that is, "[u]nder *Hodari,* while such a seizure requires a show of authority objectively sufficient to convince the reasonable person he is not free to leave, it also requires that the suspect actually submit to the show of authority." *United States v. Coggins,* 986 F.2d 651, 653 (3d Cir.1993).

In *Hodari,* a group of youths fled as police officers approached in an unmarked car. The police gave chase and upon encountering one of the officers, one of the youths, Hodari, threw down what later turned out to be crack cocaine. Thereafter, the officer tackled and handcuffed Hodari. A juvenile proceeding was brought against him, and he attempted to suppress the evidence relating to the cocaine. The issue that the court considered was whether Hodari was seized within the meaning of the Fourth Amendment at the moment that he threw the cocaine. The court held that for Hodari to have been seized under the Fourth Amendment, he would have had to have submitted to the officers' show of authority. Assuming that the police pursuit constituted a show of authority, the court concluded that because he did not comply with that exertion of authority, there was no seizure until the officer tackled him. *Hodari,* 499 U.S. at 629, 111 S.Ct. 1547.

 Here, defendants argue that, like Hodari, Smith was never seized because he eluded the police by fleeing into the woods behind his house and because police never took him into custody. We find that defendants are correct, that under *Hodari,* Smith was not seized. Although the police did make a show of authority in surrounding Smith's house with negotiation and

and thus in the instant case, since the qualified immunity analysis is identical under Section 1983 and under *Bivens v. Six. Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). *Wilson v.* *Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999); *Jorden v. Nat'l Guard Bureau,* 799 F.2d 99, 105–06 (3d Cir.1986); *Lattany v. Four Unknown U.S. Marshals,* 845 F.Supp. 262, 265 (E.D.Pa.1994).

tactical teams [13], Smith did not submit to this show of authority. To constitute submission to authority, the suspect must "clearly acquiesce" to the officers's show of authority, and "[i]t must be the official show of authority that produces the suspect's acquiescence." *United States v. Baxter*, No. 00–4778, 2001 WL 685638, at *1 (4th Cir. June 19, 2001). Smith did not submit to the officers' requests that he come outside and, assuming that Smith was the individual who moved from the house to the shed area, did not submit to the officers' calls. He disappeared into the woods, and the police did not encounter him until they recovered his body on July 18, 2001.

### ii. *Citation Against Smith*

■ Plaintiffs argue in response that, apart from *Hodari*, defendants did arrest Smith (1) when they cited him and (2) when they surrounded his residence. Plaintiffs cite to the deposition testimony of Hall and Marasco, who both stated that citing an individual is the same as arresting that person to support the proposition that a citation constitutes an arrest. However, plaintiffs do not cite to any legal authority to support that proposition. Nevertheless, our own review has revealed that a citation can in fact constitute a seizure for Fourth Amendment purposes. *See, e.g., Dotson v. City of Youngstown, Ohio*, 76 F.Supp.2d 810, 814 (N.D.Ohio,

1999). However, the issuance of a citation does not necessarily trigger the Fourth Amendment. Typically, the issuance of the citation must also result in the individual's freedom of movement being somehow restrained. *See, e.g., Moyer v. Borough of North Wales*, No. CIV.A. 00–CV–1092, 2001 WL 73428 (E.D.Pa.Jan. 25, 2001) (holding that in context of false arrest claim under Section 1983, written citation for disorderly conduct did not constitute an arrest or a seizure); *Niedlinger v. Brennan*, No. CIV.A. 96–CV–2704, 1998 WL 254019, at *2 (E.D.Pa. May 5, 1998) (holding that where plaintiff's freedom of movement was never restrained, issuance of summary offense citation did not constitute a seizure). Here, plaintiffs have offered no evidence that the *citation* in any way caused Smith's freedom of movement to be curtailed. The officers did not take Smith into custody in issuing the citation; nor was Smith compelled to make an appearance in court as a result of the issuance of the citation. We find the issuance of the citation did not result in a seizure of Smith.

### iii. *Surrounding of Smith*

■ Plaintiffs also argue that the officers seized Smith when they surrounded him, establishing a secure perimeter around the area in which he was located and communicating to him that he was not free to leave.[14] Plaintiffs are correct that

---

13. A show of authority exists when "the officer's words and actions would have ... conveyed the message [to a reasonable person] that he was not free to disregard the police and go about his business." *Hodari*, 499 U.S. at 628, 111 S.Ct. 1547. It is safe to assume that a reasonable person would not believe that he/she was free to disregard the police if armed SERT members had secured a perimeter around his/her residence and were repeatedly attempted to make contact with him/her over the phone and via a public address system.

14. We note that plaintiffs frame their discussion of whether Smith was arrested in terms of *Hodari*. Their argument appears to be that even if Smith fled, he was always within a confined area and was never successful in any attempt he made to flee; thus, he ultimately succumbed to the defendants' show of authority. We find that there is no evidence, as is required under *Hodari*, that Smith "clearly acquiesced" to the officers' show of authority. *See, e.g., United States v. Baxter*, No. 00–4778, 12 Fed.Appx. 170, 171, 2001 WL 685638, at *1 (4th Cir. June 19, 2001) (holding that sus-

conduct that falls short of a full-blown arrest can constitute a seizure. *See generally Terry v. Ohio,* 392 U.S. 1, 16–18, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *see also Gallo v. City of Philadelphia,* 161 F.3d 217, 223 (3d Cir.1998). Additionally, "an actual physical touching is not required to effect a seizure." *Gallo,* 161 F.3d at 223 (citations omitted). Rather, "a seizure is a show of authority that restrains the liberty of a citizen ... or a government termination of freedom of movement intentionally applied." *Id.* (internal quotations and citations omitted).

 Plaintiffs do not specify at what point they contend the alleged seizure or arrest occurred. Nevertheless, the record shows the following sequence of events: (1) Marasco and Scianna arrived at the Smith residence in response to a complaint by his neighbor and attempted to make contact with Smith; (2) unsuccessful in their initial attempts to make contact with Smith, Marasco and Scianna went to the back of the house and at some point observed a red light and retreated; (3) M. Rodriguez, T. Rodriguez and several municipal officers arrived to provide back-up assistance; (4) M. Rodriguez and T. Rodriguez observed an individual move from the house to the shed; (5) SERT arrived and relieved the officers already at. the scene who had begun to make a perimeter; (6) warrants were obtained; and (7) officers searched the house and shed. Whether it is plaintiffs' contention that the arrest occurred when the state officers first approached and began to secure the perimeter or when the response heightened to involve the activation of SERT members who created a more secure perimeter, we conclude that, at the very least, a seizure

occurred when the negotiation and tactical teams, armed with machine guns, tear gas and distraction devices, appeared, secured the perimeter, set up roadblocks and utilized the P.A. system to contact Smith. There is no doubt that at this point, there was a clear show of physical force and assertion of authority. If Smith was present at this point, his liberty was significantly restrained; no reasonable person in Smith's position would have believed that he/she was free to remain in the house and ignore the police presence. *See Sharrar v. Felsing,* 128 F.3d 810, 819–20 (3d Cir.1997) (holding that arrest occurred when a SWAT team surrounded residence with machine guns pointed at the windows and ordered persons inside to leave the house backwards with their hands raised); *see also United States v. Saari,* 272 F.3d 804, 807–09 (6th Cir.2001) (holding that seizure occurred when officers positioned themselves in front of the only exit from defendant's apartment with their guns drawn and knocked forcefully, announcing that they were the police and ordering defendant to come outside); *United States v. Maez,* 872 F.2d 1444, 1449–51 (10th Cir. 1989) (holding that where FBI agents and a SWAT team surrounded trailer and with guns pointed asked him and his family to come out, arrest occurred in home even though officers did not physically enter trailer and he was formally taken into custody once he exited the trailer); *United States v. Al–Azzawy,* 784 F.2d 890, 893 (9th Cir.1985) (holding that arrest occurred inside residence where police completely surrounded defendant's trailer with weapons drawn and ordered him through a bullhorn to leave trailer and drop to his knees); *United States v. Morgan,* 743 F.2d 1158, 1166 (6th Cir.1984) (holding that arrest occurred inside defendant's home

pect did not submit to show of authority by slipping on patch of ice). Nonetheless, we think that regardless of whether Smith fled or ultimately submitted to a show of authority,

there is legal support for the argument that Smith was in effect arrested when the officers surrounded him. We treat this argument independent of our analysis of *Hodari.*

where nine police officers and several patrol cars surrounded defendant's home and called on bullhorn for defendant to come out of the house).[15]

Moreover, we think that it is important that in this case, the officers *did* eventually obtain an arrest warrant. By retreating, calling for back-up assistance and securing the perimeter, the officers did that which was necessary to ensure their own safety. Then, when it was safe to do so, they obtained the arrest warrant; the officers could not have obtained the warrant any sooner than they did.

**x. *Degree of Force Used***

**xi. *Force Implicated by Surrounding Smith***

Because plaintiffs' excessive force claim meets the threshold seizure requirement, we will consider whether the force that was used was excessive. Plaintiffs suggest that there was no need for the use of force and, thus, that any force that was used, including that which was generated by the fact of police presence, was unreasonable.

■ We note at the outset that an excessive force claim may be made out

---

**15.** Plaintiffs make the argument that Smith was arrested when the officers surrounded him so as to show that Smith was seized in order to advance their Fourth Amendment excessive force claim. We note that the cases cited to here, holding that an arrest can occur when the police surround a suspect and hail him from outside before any physical contact is made, arose in a slightly different context. The issue the courts considered in these cases was whether in such circumstances the suspect was arrested in his/her home in violation of *Payton v. New York,* 445 U.S. 573, 576, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).

Even though plaintiffs rely on this line of cases primarily to show that an arrest occurred so as to support their excessive force claim and although we consider these cases primarily in deciding that Smith was seized, plaintiffs touch on the *Payton* analysis (Pls.' Mot. for Sum. Judg. at 55) and we therefore consider whether plaintiffs could make out a claim under *Payton.*

The police may make a warrantless arrest based on probable cause in public without violating the Fourth Amendment, even absent any exigent circumstances. *United States v. Watson,* 423 U.S. 411, 423–24, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). However, *Payton* holds that the police may not enter an individual's home without that individual's consent to make a warrantless routine felony arrest, even if based on probable cause, unless there are exigent circumstances. In the cases cited, the defendants argued, and the courts agreed, that they were arrested in their homes in violation of *Payton* when the police made a show of force by surrounding the homes and summoning the individuals from outside such

that reasonable individuals in their positions would believe that their liberty had been restricted.

We find that plaintiffs in this case do not have a *Payton* claim. This discussion assumes that Smith was in the house or shed area at the time the back-up police officers first arrived and began to establish a perimeter, and when SERT members secured the area and made oral demands.

It is undisputed that when SERT first arrived, there was no arrest warrant. Nevertheless, we find under all the facts that there were exigent circumstances justifying their surrounding the house and hailing Smith from outside. Officers Marasco and Scianna believed that a laser-sighted weapon had been directed at Scianna; they knew that Smith possessed weapons.

We note that this case is distinguishable from cases, including several of the cases cited to, that have held that the mere presence of a weapon does not constitute exigent circumstances. *See, e.g., Sharrar,* 128 F.3d at 820. Here, the officers had reason to believe that the weapon was directed at them and may be used against them, and reasonably feared for their safety.

Plaintiffs would argue that some of the officers thought that the light was emanating from the yard, rather than from the house. We find that this is not of consequence. The fact that there may have been a laser-sighted weapon aimed at the officers-regardless of whether it came from the house or from somewhere else on the property-coupled with the fact that Smith possessed weapons, created the exigency.

where there has been no physical contact between the defendant-officers and the plaintiff-suspect. *See Martin v. Board of County Comm'rs of the County of Pueblo,* 909 F.2d 402, 406 (10th Cir.1990) ("... courts have recognized excessive force claim where the force is expressed by means other than physical contact."); *Peters v. City of Biloxi, Mississippi,* 57 F.Supp.2d 366, 374 (S.D.Miss.1999) ("... force may be expressed by means other than physical contact"); *Richard v. City of Harahan,* 6 F.Supp.2d 565, 573 (E.D.La. 1998) ("Clearly, force can be expressed by means other than physical contact."); *but see Grazier v. City of Philadelphia,* No. CIV.A. 98–CV–6063, 2001 WL 1168093, at *13 n. 5 (E.D.Pa. July 26, 2001) ("It is doubtful that plaintiffs could maintain a claim for excessive force under the Fourth Amendment when the officers did not apply any force directly to them."); *see also McDonald v. Haskins,* 966 F.2d 292, 294 (7th Cir.1992) (recognizing excessive force claim based on threatening plaintiff at gunpoint); *Sims v. Glover,* 84 F.Supp.2d 1273, 1288–89 (M.D.Ala.1999) (deciding that coercion and command for individual to submit to strip search could form basis

for excessive force claim). Indeed, at least one circuit has held that the decision to deploy a SWAT team may in itself constitute excessive force. *See Holland v. Harrington,* 268 F.3d 1179, 1190 (10th Cir. 2001).[16] Thus, we consider under traditional/typical Fourth Amendment analysis whether the decision to activate SERT or the tactics used by SERT members constituted excessive force.[17]

#### ii. *Reasonableness of Force Used*

 A claim for excessive force "should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (quoting *Tennessee v. Garner,* 471 U.S. 1,

**16.** *Holland* considered the threshold issue of whether the decision to use a SWAT team, even aside from the conduct of the SWAT team members, constituted a seizure such that the Fourth Amendment was implicated. The court reasoned that "[t]he decision to deploy a SWAT team ... necessarily involves the decision to make an overwhelming show of force-force far greater than that normally applied in police encounters with citizens" and noted that "it is the SWAT team's extraordinary and overwhelming show of force that makes 'dynamic entry' a viable law enforcement tactic in dealing with difficult and dangerous situations." *Holland,* 268 F.3d at 1190. For these reasons, the court concluded that the decision to deploy a SWAT team was not beyond Fourth Amendment scrutiny. *Id.* Accordingly, the court stated that "[w]here a plaintiff claims that the use of a SWAT team to effect a seizure itself amounted to excessive force, we review the decision to use that de-

gree of force [as courts do all Fourth Amendment excessive force claims] by balancing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.* (internal quotations and citations omitted).

**17.** We note that this case differs from other cases in which courts have considered whether the deployment of a SWAT team and the tactics used by the team constitute excessive force. In the typical case, the suspect surrenders in response to the SWAT team's maneuvers and is immediately taken into custody. Here, Smith was not found until nearly a week later. This discussion assumes that which is unclear from the record: that Smith was in the area when SERT was engaged and when SERT made its advances.

8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). The Supreme Court has explained that the reasonableness inquiry in an excessive force case is an objective one: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham* at 397, 109 S.Ct. 1865, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443. The Fourth Amendment reasonableness test requires careful attention to the facts and circumstances of each particular case, including "the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Sharrar*, 128 F.3d at 822.

▮ The "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. In making the determination of whether the use of force was reasonable or excessive, the court must allow for the fact that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443.

"Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment." *Id.* at 396, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (internal quotations omitted).

▮ We find that the decision to activate SERT was reasonable. There is no dispute that several of the officers knew that Smith possessed weapons and knew that Smith had a history of mental health problems. The officers first on the scene believed that someone had directed a laser-sighted weapon at the officers. Believing that their lives were in danger, the officers did that which was necessary to ensure their safety; they retreated, called for back-up assistance, and, when attempts to make contact with Smith were unsuccessful, made the decision to active SERT, a team composed of professionals who are trained in negotiation and tactical maneuvers. The officers who retreated and called for assistance, and the officers who initially appeared and started to make a perimeter, were making split-second decisions where there was a real risk that their lives were in danger. Reasonable officers in their position would have done the same.[18]

▮ Likewise, the tactics utilized by SERT, including the creation of a secure perimeter, communication via the public address system and the entry into the house and shed with the use of distraction devices and tear gas[19], were reasonable and did not constitute excessive force. The officers had reason to believe that

---

18. Had the police used untrained officers or civilians instead of SERT members, plaintiffs could have made an argument that these professionals should have been called because of their training in negotiation and Smith's known volatile nature. It is always possible to second-guess a difficult situation.

19. We note again that it is unclear at what point Smith left the residence; this discussion looks at plaintiffs' claim in the light most favorable to plaintiffs and credit plaintiffs' allegations such that, even, as is apparently the case, if Smith moved from the house to the backyard before SERT entered the house, he remained in the perimeter area when these devices were used.

there was an armed individual in the area, and justifiably created a perimeter and used roadblocks. Knowing that Smith suffered from PTSD, the officers acted reasonably in hailing Smith through the public address system; plaintiffs can point to no evidence showing that the officers made any inappropriate comments or demands on Smith.[20] Only after hours of receiving no response from Smith and only after obtaining an arrest warrant and a search warrant did the officers enter the home. The use of distraction devices and tear gas was reasonable given the potential for violence and the length of time that had passed without there being any response from the residence.

The Third Circuit's decision in *Sharrar v. Felsing*, 128 F.3d 810 (3d Cir.1997) supports the conclusion that the officers used only that force which was necessary and reasonable. There, the court upheld the district court's grant of summary judgment against the Section 1983 plaintiffs under facts suggesting force far more extreme than presented here. In *Sharrar*, officers responded to a report that a woman had been attacked by her ex-husband and his friends. An FBI agent and twenty

officers, including a hostage negotiator and SWAT team members armed with machine guns, appeared on the scene, created an inner and outer perimeter and while arresting the men, required the arrestees to lie face down in the dirt and subjected them to threats. The court held that the officers' conduct, even though "akin to the Rambo-type behavior associated with police in overdramatized B movies," was reasonable under the circumstances where the officers were arresting four men, one of whom had used a gun in the encounter that could still pose a threat. *Sharrar*, 128 F.3d at 822.

Finding that plaintiffs have failed to make out an excessive force claim, it is not necessary for us to consider defendants' alternative argument that they are entitled to qualified immunity. We grant summary judgment in favor of all of the defendants on plaintiffs' excessive force claim.

xii. *Malicious Prosecution Claim*[21]

a. *Introduction*

 Plaintiffs claim that defendants lacked probable cause to charge Smith. "A civil rights claim for malicious prosecution is actionable under section 1983."

---

**20.** The officers consistently testify that they addressed Mr. Smith by his name and only asked him to come out to talk to them or to pick up the phone. (J. Marasco Dep. at 72–73; M. Rodriguez Dep. at 79–80.) Plaintiffs have offered no evidence to the contrary.

**21.** Plaintiffs assert in their discussion of the Fourth Amendment claim, among other things, that "Wenger, with the advise and consent of at least Weaver, Marasco, Carbonell, Fetterolf, and Marcantino, obtained a search warrant not supported by probable cause" and that "The SERT team worked together with the Trooper members to execute the warrant, even though they lacked probable cause to believe that either Mr. Smith or any laser-equipped weapon was in the house." (Pls.' Opp. To Defs.' Renewed and Amended Mot. for Sum. Judg. at 50).

It is unclear whether these allegations are part of plaintiffs' malicious prosecution claim

or whether they form the basis of another, independent claim based on the Fourth Amendment's right to be free from unreasonable searches. Insofar as these allegations are part of the malicious prosecution claim, they are addressed here in this section.

To the extent that these allegations state a separate Fourth Amendment claim, we find that there was probable cause to believe that Smith and laser-sighted weapons might be found in the house. Our independent review of the facts leads us to conclude that there was probable cause to believe that Smith and laser-sighted weapons were located on the property. Although the officers did not positively identify Smith on the evening in question, they knew that Smith resided there and had reason to believe that there was someone in the residence that evening. At some point, they observed an individual whom they believed to be Smith move from the house to the

*Telepo v. Palmer Twp.,* 40 F.Supp.2d 596, 609 (E.D.Pa.1999). In *Albright v. Oliver,* 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), the United States Supreme Court reasoned that if a malicious prosecution violated a constitutional right, it most likely violated the Fourth Amendment. Some courts have, since *Albright,* held that malicious prosecution claims must be based exclusively on the Fourth Amendment. *Martin v. City of Philadelphia,* No. 98–CV–5765, 2000 WL 11831, at *4 (E.D.Pa. Jan. 7, 2000). However, the Third Circuit has instead interpreted *Albright* more broadly and has held that "a section 1983 claim may be based on a constitutional provision other than the Fourth Amendment;" however, such a claim cannot be based on the substantive due process component of the Fourteenth Amendment. *Torres v. McLaughlin,* 163 F.3d 169 (3d Cir.1998). Thus, we must determine whether or not plaintiffs' claim is based on substantive due process. Based on the wording of plaintiffs' section 1983 malicious prosecution claim, we find that plaintiffs' claim is not grounded in substantive due process, but in the Fourth Amendment right to be free from unreasonable seizures.[22]

### b. Elements of Malicious Prosecution Claim

■ The common law elements for a malicious prosecution claim in Pennsylvania are: (1) the defendants initiated a criminal proceeding; (2) which ended in plaintiff's favor; (3) which was initiated without probable cause; and (4) the defendants acted maliciously or for a purpose other than bringing the defendant to justice. *Lippay v. Christos,* 996 F.2d 1490, 1502 (3d Cir.1993). The Court in *Albright* made clear that a Section 1983 plaintiff alleging malicious prosecution under the Fourth Amendment must show, in addition to the common law tort elements, "some deprivation of liberty that rises to the level of a Fourth Amendment 'seizure ...'" *Torres v. McLaughlin,* 163 F.3d at 175. These elements are discussed below.

### i. Seizure for Malicious Prosecution Purposes

■ The Third Circuit has set forth a low threshold for a finding of seizure in the

---

shed in the backyard. Additionally, Smith had contacted relatives and friends, saying that their were police outside of his house; Smith's daughter, Dana, communicated this to police. (D. Smith Dep. at 22–25.) These facts together establish probable cause to believe that Smith was in the area. As to the laser-sighted weapon, two officers made observations consistent with their being a laser-sighted weapon in the area; they observed a red light in the window and a red dot on the person of Scianna that tracked his movements. These observations, coupled with the fact that they knew that Smith possessed weapons, establish that there was probable cause to believe that a laser-sighted weapon might be located in the area.

We note also that in Count III, plaintiffs state that defendants violated the rights not only of Robert Smith but also of Pauline Smith, Dana Smith and Wanda Smith to be free from unreasonable searches and seizures. Presumably Smith's wife, who was out of state during the incident in question, had some property interest in the home. However, plaintiffs have not offered any evidence showing how her rights or the rights of his daughters were violated by the defendants' actions. Thus, we grant summary judgment as to plaintiffs' Fourth Amendment claim in favor of defendants insofar as this claim is based on violations of Smith's relatives' rights.

**22.** Count V of plaintiffs' complaint is titled "COUNT V—42 U.S.C. § 1983—MALICIOUS PROSECUTION VIOLATION OF FOURTH AMENDMENT RIGHTS." Plaintiffs allege that defendants "denied Mr. Smith his rights *under the Fourth Amendment* to the United States Constitution, including his right to be free from malicious prosecution ..." (emphasis added). Plaintiffs' claim thus is based clearly on the Fourth Amendment.

context of a Section 1983 malicious prosecution claim. *Gatter v. Zappile*, 67 F.Supp.2d 515, 519 n. 6 (E.D.Pa.1999). Indeed, something less than a forcible detention can constitute a seizure in this context. *Britton v. Maloney*, 196 F.3d 24, 29 (1st Cir.1999) (commenting on Third Circuit case law). The Third Circuit has held that post-indictment restrictions placed on a defendant, such as requiring the defendant to post a bond, attend all court hearings over an eight-and-a-half month period, contact Pre-trial Services weekly, and prohibiting the defendant from traveling out of state, constituted a seizure for purposes of malicious prosecution. *See ·Gallo v. City of Philadelphia*, 161 F.3d 217, 222 (3d Cir.1998). The court reasoned that plaintiff's liberty "was constrained in multiple ways for an extended period of time." *Id.*, 161 F.3d at 225.

■■■ Despite this liberal reading of the seizure requirement, it is also clear that "any seizure alleged to be in violation of the Fourth Amendment must be made pursuant to 'legal process.'" *Martin v. City of Philadelphia*, No. 98–CV–5765, 2000 WL 11831, at *5 (E.D.Pa. Jan. 7, 2000); *see also Nieves v. McSweeney*, 241 F.3d 46, 54 (1st Cir.2001); *Singer v. Fulton County Sheriff*, 63 F.3d 110, 116 (2d Cir.1995); *Mateiuc v. Hutchinson*, No. CIV–A–97–1849, 1998 WL 240331, at *3 (E.D.Pa. May 14, 1998). This is because "the constitutional violation is in the deprivation of liberty accompanying the prosecution," rather than in the prosecution itself. *Gallo*, 161 F.3d at 222. Legal process typically consists of an arrest warrant, in which case the arrest itself may constitute the seizure, or a subsequent charging document, in which case any post-arraignment or post-indictment deprivations of liberty may constitute the seizure. *See Nieves*, 241 F.3d at 54; *Singer*, 63 F.3d at 117; *Mateiuc*, 1998 WL 240331 at *3.

■■■ Plaintiffs cannot show that there was a seizure made pursuant to legal process. Assuming that the criminal complaint [23] constitutes the sort of legal proceeding necessary to make out a malicious prosecution claim [24], plaintiffs fail to establish the seizure requirement because they have not shown the necessary causal link; they cannot show that this legal action *resulted in* any seizure of Smith. As discussed *supra* at 340–43, Smith was seized when the officers, arming themselves with weapons and utilizing a public address system to hail Smith, made a show of force by creating a perimeter and surrounding his residence. This, however, occurred prior to their filing the criminal complaint against Smith to obtain the arrest warrant. Thus, this is not the case where an arrest warrant causes a seizure; here, any seizure that was effected took place prior to the filing of the criminal complaint. Plaintiffs have not demonstrated that there was a seizure *pursuant to legal process* or that

**23.** Plaintiffs contend that defendants "did not have probable cause to prosecute Mr. Smith" and "lacked probable cause to charge Mr. Smith." (Pls.' Opp. to Defs.' Mot. for Sum. Judg. at 52.) Presumably, by "prosecute" and "charge," plaintiffs are referring to the filing of the Police Criminal Complaint. The record shows that on July 11, 1999, Trooper Weaver filed a criminal complaint and an affidavit in support thereof, alleging that Smith committed aggravated assault and simple assault against Trooper Scianna and reck-lessly endangered Trooper Scianna. The record ·also includes a letter from the district attorney's office to a state court judge, indicating that Trooper Weaver wished to withdraw the criminal complaint filed against Smith and that the assistant district attorney agreed with the decision.

**24.** The officers' filing of the criminal complaint and thereupon obtaining an arrest warrant presumably constitute legal process.

any deprivation of liberty was directly linked to the complaint or warrant.[25]

### ii. Second Element: Proceedings Terminated in Favor of Plaintiff

■■■ Plaintiffs have also not established that the proceedings terminated in favor of the plaintiff.[26] This element requires that plaintiffs show that "the prior action disposed of the charges in a manner inconsistent with guilt." *Haefner v. County of Lancaster*, 520 F.Supp. 131, 133 (E.D.Pa.1981). Indeed, "[n]o federal claim can exist without proof that the prior state criminal prosecution ended in a manner inconsistent with guilt." *Id.* Here, the criminal complaint that was filed in support of the warrants was withdrawn.[27] We find that the mere withdrawal of the complaint does not indicate that Smith was innocent of the offenses charged.[28]

### iii. Third Element: Lack of Probable Cause

■■■ Plaintiffs have also failed to establish that defendants lacked probable cause to arrest Smith when they applied for the warrant. While the existence of probable cause is generally a jury question, it may be appropriate for summary judgment "where the uncontroverted facts could not lead a reasonable person to find that probable cause was lacking." *Gatter v. Zappile*, 67 F.Supp.2d 515, 519 (E.D.Pa.1999) (internal quotations and citations omitted). "A showing of probable cause requires proof of facts and circumstances that would convince a reasonable, honest individual that the suspected person is guilty of a criminal offense." *Id.* Probable cause does not require the officers to have evidence beyond a reasonable doubt; the probable cause standard is lower. *Telepo v. Palmer Twp.*, 40 F.Supp.2d 596, 611 (E.D.Pa.1999).

■■■ Based on the evidence in this case, no reasonable juror could conclude that the officers lacked probable cause. No one disputes that Scianna observed a red light appear in the window of the Smith residence and that Marasco saw a red dot appear on Scianna's person. Additionally, it is clear that the officers were unsuccessful in their many attempts to make contact with Smith. Furthermore, defendants knew that Smith possessed weapons, and that there was a history of disputes between Smith and his neighbor, which in-

---

**25.** A warrantless arrest cannot be the basis for a malicious prosecution claim. *See Heck v. Humphrey*, 512 U.S. 477, 484, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994); *Whiting v. Traylor*, 85 F.3d 581, 585 n. 8 (11th Cir.1996); *Nieves*, 241 F.3d at 54. Rather, a warrantless arrest made without probable cause, wherein the deprivation of liberty arises from the point of the arrest until the time of arraignment, finds its analog in the tort of false arrest. *Singer*, 63 F.3d at 117.

**26.** We note that favorable termination is a threshold issue. *Brown v. Johnston*, 675 F.Supp. 287, 289 (W.D.Pa.1987).

**27.** Pennsylvania State Police requested that the charges against Smith be withdrawn, and First Assistant District Attorney of Barks

County Iva C. Dougherty wrote a letter to District Judge Stoudt stating that she agreed with the decision to withdraw the complaint. (Letter from I. Dougherty to District Judge Stoudt, Dated July 12, 1999.)

**28.** Officers filed the criminal complaint on July 11, 1999. The complaint was withdrawn on July 12, 1999. Snyder discussed his decision to withdraw the charges during his deposition. He explains that he decided that the warrants should be withdrawn on the basis of the fact that no one was able to positively identify Smith during the incident on July 10–11, 1999. (Snyder Dep. at 140.) We find that his decision does not in itself establish that Smith was in fact innocent of the charges, and because of Smith's death, no determination could have been made.

volved complaints that Smith had shot out the neighbor's lights. Regardless of whether some officers believed that the light emanated from a source away from the house, the uncontroverted facts show that defendants reasonably believed that Smith had directed a laser-sighted weapon at Scianna and thus had committed an assault against Scianna and had recklessly endangered his life.

Having found that plaintiffs failed to establish that defendants maliciously prosecuted Smith, we need not address defendants' alternative qualified immunity argument. We grant summary judgment in defendants' favor on the Section 1983 malicious prosecution claim.

### 3. *Unreasonable Search and Seizure Claims*

#### xiii. *Entry into the Curtilage*

Plaintiffs claim that "Marasco and Scianna searched the curtilage without a warrant." (Pls.' Opp. to Defs.' Renewed and Amended Mot. for Sum. Judg. at 50.) The Fourth Amendment protects both the home and its curtilage from unreasonable searches. *See Oliver v. United States,* 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). The curtilage is "the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life." *Id.,* 466 U.S. at 180, 104 S.Ct. 1735.

It is undisputed that prior to their obtaining a warrant, Marasco and Scianna, walking around Smith's house, entered the curtilage where Smith had a legitimate expectation of privacy. Nevertheless, we find that their conduct was not unreasonable. The officers had a legitimate reason for entering Smith's property unconnected to any search of the property; that is, Marasco and Scianna were responding to neighbor Shafer's complaint that Smith's

lights were shining onto his property. They were clearly entitled to approach Smith's residence in order to respond to this matter. We cannot say that their conduct in walking around the house and proceeding to the rear of the house was so incompatible with their original, legitimate purpose as to violate the Fourth Amendment. *See United States v. Wheeler,* 641 F.2d 1321 (9th Cir.1981) (deciding that agents' conduct in moving to rear of house after receiving no answer at front door was not incompatible with scope of original purpose of responding to civil dispute between tenant on one side of duplex and owner on other side of duplex and did not violate Fourth Amendment); *United States v. Bradshaw,* 490 F.2d 1097 (4th Cir.1974) (holding that officers were entitled to enter defendant's premises in order to investigate abandoned vehicle and did not exceed scope of legitimate purpose for being there by walking around house to back door when unable to receive answer at front door); *see also United States v. Brady,* 734 F.Supp. 923 (E.D.Wash.1990) (finding that defendant did not have reasonable expectation of privacy that precluded officer from approaching outbuildings and knocking on door or calling out to see if anyone is home); *Goldberg v. Weil et al.,* 707 F.Supp. 357 (N.D.Ill.1989) (finding that neither search nor seizure occurred when officers went into back yard to establish contact with plaintiff).

We grant summary judgment in defendants' favor insofar as plaintiffs' Fourth Amendment Section 1983 claim is based on the officers' conduct in entering the curtilage.

#### xiv. *Viewing of Videotape*

"Where evidence is uncovered during a search pursuant to a warrant, the threshold question must be whether the search was confined to the warrant's

terms." *United States v. Rettig,* 589 F.2d 418, 423 (9th Cir.1978). Those executing the warrant must take care to direct their search towards the items specified in the warrant and towards other means and instrumentalities by which the particular crime was committed; they must not conduct a general exploratory search. *Id.* Here, the warrant authorized the officers to search for "[a]ny and all firearms, including handguns, shotguns, rifles, or any combination thereof, including those equipped with laser-sights or those capable of being equipped with such, as well as any instrument, device and/or object capable of projecting a laser-type beam visible to the naked eye." (Comm. of Penn., County of Berks App. for Search Warrant and Auth., Warrant Control # L01–0638117A, Dated July 11, 1999.) Pursuant to the search warrant, the officers seized several guns from Smith's residence; they also located a video camera and rewound and viewed a videotape that was located in it.

Plaintiffs allege that "Weaver, with Wenger standing by, exceeded the scope of the warrant, rewinding and viewing a video cassette that they had no right to view." (Pls. Opp. to Defs.' Renewed and Amended Mot. for Sum. Judg. at 50.) We reject this contention and find that the video camera and videotape fall under the terms of the warrant. We read the warrant to authorize the seizure of anything, like the video camera, that might have generated the red light. When Scianna first noticed the red light in the upstairs window, he initially believed that someone was videotaping them. After entering the house and not locating any laser-sighted weapons, the possibility of the video camera being the source of the light was reinforced. In fact, Wenger testified in his deposition that during the search, the video camera caught his attention because it had a red light on

the front of it. (Wenger Dep. at 88.) The officers could have reasonably believed that the video camera was the source of the light and were justified, under the warrant, in seizing it. If by viewing the tape they had seen only pictures of the first officers on the scene, they might have had further evidence that the camera, and not a firearm, was pointed at them.

■■■■■■ Even were the tape not to fall within the express terms of the warrant, it was permissibly seized as evidence having a connection to the crime alleged. "[E]vidence not described in a valid search warrant but having a nexus with the crime under investigation may be seized at the same time the described evidence is seized.... Such a seizure is permitted since requiring officers lawfully searching premises to obtain additional warrants for items already discovered but not specifically named in the first warrant is an encumbrance on the law enforcement system." *United States v. Levesque,* 625 F.Supp. 428, 450 (D.N.H.1985) (internal quotations and citations omitted). Here, the officers had reason to believe that a video camera may have been used that night. They could reasonably conclude that the tape would reveal whether the crime had in fact occurred; that is, whether a laser-sighted weapon was directed from the house at the officers. If the officers believed that the tape contained evidence of the suspected crime, they would be justified not only in seizing it but also in viewing its contents. *See United States v. Bonfiglio,* 713 F.2d 932 (2d Cir.1983) (upholding district court's conclusion that once cassette tape was in lawful possession of agents, they had a right to play it).[29]

We grant summary judgment in defendants' favor on plaintiffs' Fourth Amendment Section 1983 claim insofar as it is

---

**29.** Moreover, defendants ultimately obtained a warrant for the video recorder and tape.

based on the defendants' seizing the video camera and videotape prior to obtaining a warrant specifying the videotape.

### c. *Second Search Warrant*

 Plaintiffs also allege that "Wenger, again with the assistance of at least Weaver, obtained and executed a second search warrant for items that served no legitimate law enforcement objectives." (Pls.' Opp. to Defs.' Renewed and Amended Mot. for Sum. Judg. at 50–51.) The second search warrant authorized the seizure of "Panasonic VHSC Palmcorder, Model PV–C858d, 23X High Definition Zoom lens, black in color, and recording tape contained therein, recording tapes from any telephone answering machine, handwritten note on a white Reading Eagle Co. envelope which read, 'Wanda, feed dog and cat.'" (Comm. of Penn., County of Berks App. for Search Warrant and Auth., Warrant Control # L01–0631817B, Dated July 11, 1999.) Defendants contend that this warrant was obtained because they believed that the seizure of these items would further the investigation into the alleged criminal acts. We agree. As noted above, the officers had reason to believe that a video camera had been used that evening; it is reasonable to assume that the video tape would then contain evidence of the evening's events. Likewise, messages may have been left on Smith's answering machine that would indicate what had occurred inside the home that evening and/or Smith's whereabouts. The envelope apparently requesting that his relative take care of the pets suggests that he did in fact flee from the area and thus bears on the alleged crime. We find that the officers acted pursuant to legitimate law enforcement objectives in obtaining and executing this second search warrant. Plaintiffs have failed to show a Fourth Amendment violation here.

We grant summary judgment on plaintiffs' Section 1983 Fourth Amendment claim in favor of the defendants insofar as this claim is based on the officers' obtaining and executing the second warrant.

Since plaintiffs have failed to make out any Fourth Amendment claim, we need not consider defendants' alternative qualified immunity argument. Summary judgment is granted in favor of defendants on all of plaintiffs' Section 1983 Fourth Amendment claim.

### D. *Section 1983 Claims Based on Fourteenth Amendment*

### 1. *Substantive Due Process Claim*

Plaintiffs argue that the defendants' actions violated Smith's substantive due process rights under the Fourteenth Amendment, including his right to personal security and the right to be free from arbitrary governmental action that shocks the conscience.

### a. *Introduction*

 In general, state actors do not have an affirmative obligation to protect citizens from injuries caused by themselves or others. *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 195–96, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). However, there are two exceptions to this rule, whereby state actors owe a duty to citizens to protect them: (1) the special relationship exception and (2) the state-created danger exception. Plaintiffs raise both of these exceptions; we address each in turn.

### b. *Special Relationship Exception*

 Under the special relationship doctrine, state actors have a duty to rescue "'when the state fails, under sufficiently culpable circumstances, to protect the health and safety of the citizen to whom it

owes an affirmative duty.'" *Beswick v. City of Philadelphia*, No. CIV.A. 00–1304, 2001 WL 210292, at *11 (E.D.Pa. March 1, 2001) (quoting *D.R. v. Middle Bucks Area Vocational Technical School*, 972 F.2d 1364, 1369 (3d Cir.1992)). A special relationship exists when "the State by the affirmative existence of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs-e.g., food, clothing, shelter, medical care, and reasonable safety." *DeShaney*, 489 U.S. at 200, 109 S.Ct. 998. In such a case, "it transgresses the substantive limits on state action set by the . . . Due Process Clause." *Id.* This special relationship exception may apply, for example, in the case of an incarcerated prisoner or an involuntarily committed mental patient. *Cannon v. City of Philadelphia*, 86 F.Supp.2d 460, 465 n. 6 (E.D.Pa.2000).

 We find that such a special relationship did not exist in this case. Police merely approached Smith's house and attempted to make contact with him. Even though police ultimately surrounded his house, Smith's liberty was not restrained in the sense that he was prevented from caring for himself. Smith himself fled into the woods and police thereafter attempted to locate him. Plaintiffs' special relationship claim fails and summary judgment is granted in favor of defendants on the Fourteenth Amendment substantive due process claim insofar as this claim is based on the special relationship doctrine.

### c. *State–Created Danger Exception*

### i. *Introduction*

 The state-created danger exception allows for recovery under Section 1983 "when, under certain circumstances, a state actor creates a danger that causes harm to an individual." *Beswick*, 2001 WL 210292 at *11. The exception evolved out of the Supreme Court's decision in *DeShaney*. Rejecting the plaintiff's special relationship doctrine argument and holding that the county department of social services was not liable under Section 1983 for failure to protect a boy who was chronically abused by his father, the *DeShaney* Court emphasized that "[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no party in their creation, nor did it do anything to render him any more vulnerable to them." *DeShaney*, 489 U.S. at 201, 109 S.Ct. 998. Based on this language, the Third Circuit, along with several other circuits, thereafter recognized that a state actor would be liable if four conditions were met. The elements of a state-created danger claim are: (1) the harm ultimately caused was fairly foreseeable and direct; (2) the state actors acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and the plaintiff; and (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the harm to occur. *Kneipp v. Tedder*, 95 F.3d 1199, 1205, 1208 (3d Cir.1996).[30]

### ii. *County of Sacramento v. Lewis*

Following the Third Circuit's decision in *Kneipp*, the United States Supreme Court decided *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). In *Lewis*, the Court stressed that the Fourteenth Amendment is not "a font of tort law to be superimposed upon whatever systems may already be adminis-

---

**30.** We note one court's observation that "[s]ubsequent case law reflects that the state-created danger doctrine is increasingly more difficult to prove." *Roberson v. City of Philadelphia*, No. CIV.A. 99–3574, 2001 WL 210294, at *12 (E.D.Pa. March 1, 2001).

tered by the States." *Lewis,* 523 U.S. at 848, 118 S.Ct. 1708. The Court emphasized that substantive due process only protects the individual against arbitrary governmental action. *Kepner v. Houstoun,* 164 F.Supp.2d 494, 499 (E.D.Pa. 2001) (discussing *Lewis* ). The Court discussed the standard of fault necessary to maintain a substantive due process claim against a state actor and held that in substantive due process cases the action of the state actor must "shock the conscience" in order to trigger Section 1983 liability.[31] *Cannon,* 86 F.Supp.2d at 467.

Because *Lewis* addresses the overarching substantive due process framework, it applies to state-created danger claims and we keep it in mind as we address the four prongs of *Kneipp.* See *Cannon,* 86 F.Supp.2d at 466.

### iii. *First Element: Foreseeable and Fairly Direct Harm*

■ The first element of the state-created danger theory requires that the harm that is the basis for the claim be a foreseeable and fairly direct consequence of the state actor's conduct. Here, plaintiffs contend that the officers knew that Smith suffered from PTSD and, thus, that it was foreseeable that he would have an adverse reaction to a show of force by the officers. (Pls.' Opp. to Defs.' Renewed and Amended Mot. for Sum. Judg. at 44). Furthermore, because Smith suffered from several debilitating physical health conditions, it was foreseeable that once he fled, he would suffer harm. (*Id.* at 46–47). Putting aside the fact that not all of the named defen-dants knew of Smith's health problems, we find that even the officers who had knowledge of his poor health could not have reasonably foreseen that their presence would cause him to flee from the house and that his fleeing from the house would ultimately result in his suffering a heart attack alone in the woods. None of the officers made contact with Smith on the evening in question,or thereafter and none had the opportunity to observe Smith's physical condition. Moreover, for all the officers knew, Smith had fled not into the woods, but to a predetermined location to meet a relative or friend.[32]

Although causation in the state-created danger setting is often less than direct, *Sciotto v. Marple Newtown School Dist.,* 81 F.Supp.2d 559, 565, fn. 8 (E.D.Pa.1999), the facts here do not give rise to the level of foreseeability that was present in, for instance, the *Kneipp* case. There, officers encountered an inebriated woman on a roadside and, after encouraging her husband to go home, abandoned her; the Third Circuit reasoned that a reasonable jury could find that it was foreseeable that harm would befall her if she was separated from her husband while she was in an obviously intoxicated state. *Kneipp,* 95 F.3d at 1208. Here, other than possibly knowing that Smith had a history of health problems, the officers had no reason to believe that he would flee and thereafter suffer a heart attack while he was alone. Plaintiffs here have failed to establish the necessary causal connection; the first element is not met.

---

**31.** The Court recognized also that the degree of fault required to maintain a Section 1983 substantive due process claim depends upon the circumstances of the particular case. While holding that "shocks the conscience" is the requisite level of fault, the Court suggested that in certain circumstances, deliberately indifferent conduct may shock the conscience. *Cannon,* 86 F.Supp.2d at 467 n. 7.

**32.** There is evidence that Smith had contacted a friend that evening and that he asked his daughter to meet him at a nearby garage. (A. Achey Aff. at ¶¶ 1–3; D. Smith Dep. at 22–28.)

#### iv. Second Element: Conscience–Shocking Conduct

As *Lewis* and *Miller v. City of Philadelphia*, 174 F.3d 368 (3rd Cir.1999) (decided after *Lewis*), indicate, in a state-created danger case, the state actor's conduct must shock the conscience.[33] According to plaintiffs, defendants, both by their action and inaction, demonstrated their deliberate disregard for his safety in a way that shocks the conscience. Plaintiffs allege that defendants "at every turn took steps that heightened the danger to Mr. Smith." They "progressively and relentlessly ratchetted [sic] up the level of force against Mr. Smith, despite their knowledge of Mr. Smith's fragile health, his diagnosis of PTSD, his history of flashbacks to the war Vietnam, and his fear and suspiciousness of the State Police, and despite the fact that they lacked probable cause to believe that Mr. Smith had committed any crime"—the effect of which was to force Smith out of his house. (Pls.' Opp. to Defs.' Renewed and Amended Mot. for Sum. Judg. at 47–8.) They then "failed to use appropriate and available measures to bring him to safety." (*Id.* at 48).

 We find, contrary to plaintiffs' bald assertions, that defendants' actions do not shock the conscience. Officers Marasco and Scianna were legitimately at Smith's residence; they were there to respond to a complaint by Smith's neighbor. They went to the front door in an attempt to speak with Smith and when that attempt failed, they, as is routine, went to the back of the house to locate him. Upon observing a red light in the window and a dot on Scianna's person that they believed could indicate the presence of a laser-sighted weapon, they did the prudent thing, and retreated and called for assistance. Plaintiffs suggest that defendants' response was overly aggressive-that the deployment of many officers dressed in fatigues and armed with weapons to confront an individual suffering from PTSD is conscience-shocking. We do not agree. Even assuming that defendants had knowledge of Smith's health condition, we cannot say under the circumstances that their conduct shocks the conscience. Defendants knew that Smith possessed weapons, and had reason to believe that he was on the premises and was not responding to their calls. They reasonably believed that there was a laser-sighted weapon on the premises. Given these circumstances, the call for assistance, the employment of tactical and negotiation teams, the creation of a perimeter and the repeated attempts to hail Smith were all sound practice.

Plaintiffs also contend that regardless of who was at fault for Smith ending up in the wooded area, defendants failed to use appropriate and available means to bring Smith to safety; according to plaintiffs, the failure to do so is conscience-shocking. (Pls.' Opp. to Defs.' Renewed and Amended Mot. for Sum. Judg. at 48.) Plaintiffs highlight that defendants ruled out the use of negotiations and the use of a psychologist, rejected offers from family members and neighbors who wanted to communicate with Smith, prevented a neighbor from going into the wooded area to search for Smith and rejected an offer to use search dogs.

Undoubtedly, defendants rejected certain means of reaching Smith. However, we find that the officers had legitimate law enforcement purposes for doing so. There were professionals, trained in negotiation

---

**33.** The second *Kneipp* factor addresses the standard of fault necessary in order to trigger liability. This element requires that the state actor acted with willful disregard for, or deliberate indifference to, the plaintiff's safety. *Lewis* and *Miller* require that the state actor's conduct shock the conscience. *See Cannon,* 86 F.Supp.2d at 469.

tactics, on site offering their advice and participating in the negotiation attempts; it was reasonable for defendants to conclude that these individuals, rather than untrained family members or friends, were the appropriate persons to deal with someone like Smith; this decision was made as a matter of course. (G. Hall Dep. at 193.)[34] Believing that Smith could be armed, defendants' decision not to allow Smith's neighbor, an untrained civilian, to go into the woods to search for Smith was entirely reasonable and in fact worked to ensure the safety of this citizen. The neighbor himself recognized that the officers did not allow him to enter the words because they were concerned for his safety. (C. Zwicky Dep. at 13–14, 20.) Moreover, plaintiffs ignore that the officers did take this neighbor into the search helicopter so that he could point to places in the woods where Smith might be located. Defendants' rejection of the use of search dogs also does not rise to the level of conscience-shocking conduct.

Moreover, defendants did engage in a search for Smith. Officers searched the woods during the morning hours of July 11, 1999 and several times in the weeks that followed. During these searches, they read prepared statements that mentioned that Smith was not in any trouble and that his family was concerned for his safety. They also contacted several neighbors and an area hospital.

Thus, this case is unlike Kneipp, where the officers abandoned an individual in need, without taking any steps to ensure her safety. Here, defendants engaged in a search effort that encompassed parts of the densely wooded area, the surrounding

neighborhood and an area hospital; and that involved the use of officers on foot, a helicopter and the assistance of people that were close to Smith. Perhaps an argument could be made that defendants could have engaged in more thorough or lengthy searches. Nevertheless, liability may not be imposed for mere negligence. See County of Sacramento v. Lewis, 523 U.S. 833, 848–49, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) ("[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."). Defendants' actions and inaction could at most constitute negligence and do not rise to a level that would shock the conscience.

v. *Third Element: Special Relationship*

██ To satisfy the third prong of Kneipp, plaintiffs must show that there existed a special relationship between defendants and the victim. To show this, plaintiffs need not show that a custodial relationship existed[35], but must prove that Smith "was a foreseeable victim of a defendant's acts in a tort sense." Kneipp, 95 F.3d at 1209 n. 22. "A plaintiff need not prove that state actors placed a 'specific individual' in danger, but must demonstrate that 'the plaintiff was a member of a discrete class of persons subjected to the potential harm brought about by the state's actions.... Courts which have rejected plaintiffs' state-created danger claims under this prong of the test have concluded that those plaintiffs faced no danger not also faced by the public at large." Henderson v. City of Philadelphia, No. CIV.A. 98–3861, 1999 WL

---

**34.** As we have already pointed out, had SERT not been called, plaintiffs could have made an argument that SERT should have been called to do the negotiating.

**35.** "Though similarly captioned, this element of the Kneipp test is not the same as the 'special relationship' theory of liability." Henderson v. City of Philadelphia, No. CIV.A. 98–3861, 1999 WL 482305, at *10 (E.D.Pa. July 12, 1999).

482305, at *10 (E.D.Pa. July 12, 1999) (internal quotations and citations omitted).

 We find that the special relationship element is met. Without reaching the conclusion that defendants were the cause of the harm that befell Smith or that the harm that came to him was foreseeable, we find that if anyone were to be injured on the evening in question as a result of defendants' conduct, it was foreseeable that it would be Smith, who was on the property that night and who was the subject of the neighbor's complaint and the officers' investigation. In taking action against Smith and his property in their capacities as police officers, defendants created a special relationship between themselves and Smith.

vi. *Fourth Element: Creation of Opportunity for Harm*

 Under the fourth prong of *Kneipp*, plaintiffs must prove that the officers "used their authority to create an opportunity that otherwise would not have existed" for Smith to fall into harm's way. *Kneipp,* 95 F.3d at 1208. "The relevant conduct by the state actor may be either an act or an omission." *Sciotto v. Marple Newtown School Dist.,* 81 F.Supp.2d 559, 566 (E.D.Pa.1999). Plaintiffs contend that defendants, "in preventing Mr. Smith's family and neighbor from coming to his aid, blocking his return to his house, confining him to the wooded area, and preventing the use of search dogs, made Mr. Smith 'more vulnerable to harm.'" (Pls.' Opp. to Defs.' Renewed and Amended Mot. for Sum. Judg. at 49.) Defendants argue that "[t]hese actions, combined with their own limited search efforts, put Mr. Smith in a worse position and greatly increased his risk of danger." (*Id.*)

We find that plaintiffs have failed to make out the fourth element. We begin by noting that the officers had legitimate law enforcement reasons for initially preventing Smith's family and neighbor from searching the woods for him; they had reason to believe that Smith was armed and did not want to place these individuals in danger. Moreover, the officers did not completely prevent other individuals from assisting in the initial search. In fact, the officers brought Smith's neighbor up in the helicopter so that he could help them locate a hunting hideout where the neighbor believed Smith might be. Furthermore, once the officers concluded their search on July 11, 1999, the family and neighbors were not precluded from searching the area for Smith. Indeed, it was a neighbor who ultimately found Smith's body.

The officers were also justified in creating a perimeter and surrounding the area in which Smith was believed to be; this conduct was in fact standard procedure. Additionally, there is no evidence that the failure to use search dogs *increased the risk of danger* to Smith.[36] As for the search efforts, it is not at all clear that a failure to conduct a search would in itself increase the risk of danger to a person in Smith's situation; for all anyone knew, Smith was not even in the wooded area. Moreover, it is undisputed that here defendants did conduct several searches for Smith through the thickly wooded area.

This case is unlike *Kneipp*. First and foremost, unlike in *Kneipp*, where the officers observed that the decedent was intoxicated, the officers here did not observe Smith's condition and were unaware how he was feeling on the night in question. Additionally, in *Kneipp*, the officers sent the decedent's husband home and then left her alone on the roadside. Here, the offi-

---

**36.** Had dogs been used, plaintiff could have made an argument that they only served to increase the risk of harm by increasing the police presence and frightening Smith.

cers did not abandon the situation and did not totally cut off outside help. They engaged in a search themselves and, to the extent that was practicable, relied upon the help of others, like Smith's neighbor.

This case is comparable to *Henderson v. City of Philadelphia*, Civ. No. 98–3861, 1999 WL 482305 (E.D.Pa. July 12, 1999). There, defendant-police officers arrived at the home of a twenty-year-old diagnosed schizophrenic in order to oversee his involuntary commitment. While speaking with the individual's mother and reviewing the commitment papers, the individual to be committed went upstairs. The officers did not try to stop him. While he was upstairs, his mother told the officers that he might jump. The officers did not restrain him. He did jump out of the window and suffered permanent injuries. The court concluded that the fourth element was not met because the officers did nothing to increase the risk of danger to him. The court reasoned that "[t]he officers cannot be liable for the fact that their presence increased Henderson's agitation and his desire to escape." *Henderson*, 1999 WL 482305 at *12.

It is true that *Henderson* differs from the present case in that the initial source of Henderson's agitation was the initiation of involuntary commitment proceedings by his mother whereas here the police presence was presumably the source of Smith's agitation. Nevertheless, the fact that the officers may have created the agitation here is not of consequence; we have already concluded that the officers were rightfully on the premises to investigate a civil complaint and that the tactics employed by the officers were legitimate. We can conclude, as the court did in *Henderson*, that defendants cannot be liable for the fact that their legitimate presence agitated Smith and ultimately caused him to flee.

As plaintiffs have failed to establish all but one of the four necessary elements for the state-created danger claim, their substantive due process claim must fail; we need not consider defendants' alternative qualified immunity argument. Summary judgment is grated in defendants' favor on plaintiffs' substantive due process claim.

### 2. *Abuse of Process Claim*

▮ Defendants argue that "[a]n abuse of process claim is a state law claim which Plaintiffs have tried to assert as a federal constitutional claim in the complaint." (Defs.' Mot. for Sum. Judg. at 7, fn. 3.) We reject defendants' suggestion that an abuse of process claim cannot serve as the basis for a Section 1983 claim. *See, e.g., Russoli v. Salisbury Township*, 126 F.Supp.2d 821, 858 (E.D.Pa.2000) (recognizing the existence of a Section 1983 abuse of process claim).

▮ "A § 1983 claim for malicious abuse of process lies where prosecution is initiated legitimately and thereafter is used for a purpose other than that intended by the law." *Russoli v. Salisbury Township*, 126 F.Supp.2d 821, 858 (E.D.Pa.2000). Whereas the malicious prosecution tort concerns the wrongful initiation of criminal proceedings, "[a]buse of process involves a perversion of a process after it is initiated." *Id.* "To establish a claim for abuse of process, there must be some proof of a definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process." *Id.* "Abuse of process usually pertains to situations involving extortion by means of attachment, execution or garnishment, and blackmail by means of arrest or criminal prosecution." *Cameron v. Graphic Mgmt. Assocs., Inc.*, 817 F.Supp. 19, 21 (E.D.Pa.1992).

It is unclear from the plaintiffs' complaint what process they are alleging serves as the basis for this claim but presumably, the basis for their claim is the arrest and search warrants. However, plaintiffs have not alleged any facts or offered any evidence that support a claim for abuse of process. They do not maintain that the criminal action against Smith was initiated legitimately and then perverted. They have not produced any evidence that defendants desired or demanded anything other than the action's authorized conclusion-arrest. There is no evidence of any extortion or blackmail. Plaintiffs have offered no evidence supporting this claim and we need not consider defendants' alternative qualified immunity argument. We grant summary judgment in defendants' favor on plaintiffs' abuse of process claim.

### 3. *Equal Protection Claim*

■ "To bring a successful claim under 42 U.S.C. § 1983 for a denial of equal protection, plaintiffs must prove the existence of purposeful discrimination.... They must demonstrate that they received different treatment from that received by other individuals similarly situated." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir.1990) (internal quotations and citations omitted). Plaintiffs contend that the police responded differently to complaints by Shafer, a Caucasian man, against Smith than to complaints by Smith, an African–American man, against Shafer. According to plaintiffs, when Smith complained about Shafer's lights, the police responded that it was a civil matter that the Smiths would have to handle on their own, but when Shafer complained about Smith's lights, the police responded with charges and with force. (Pls.' Opp. to Defs.' Renewed and Amended Mot. for Sum. Judg. at 51–52.)

■ We find that plaintiffs have put forth no evidence whatsoever that Smith was treated differently than Shafer *because of race*. By all accounts, Officers Marasco and Scianna approached the Smith residence on the evening of July 10, 1999 with the intention of treating the complaint by Shafer like they did the earlier complaint by Smith against Shafer, as a routine matter. They intended to speak with Smith and to issue a citation. It was not until they had reason to believe that a weapon was directed at them that they changed their approach and employed force.

Plaintiffs' would respond that by some accounts, the red light appeared to emanate from behind the Smith house, the location of the Shafer–Smith boundary; they question why the officers directed force only at Smith and his property and not at Shafer and his property as well. They imply that the decision to target Smith and not Shafer was motivated by racial considerations. However, plaintiffs ignore several factors wholly unrelated to race-based concerns that clearly worked to influence the officers' approach. No one had answered the door at the Smith residence even though it appeared that someone was inside the Smith residence; this raised suspicions. (J. Marasco Dep. at 93.) Also, Scianna had observed a red light appear *in the window of* the Smith residence; this led at least some officers to believe that the source of the light was inside. Additionally, the officers knew that Smith possessed weapons and, thus, possibly a laser-sighted weapon. These considerations together justified the officers' directing their action towards Smith; we will not second-guess the actions defendants took in response to what appeared to be a dangerous situation. The considerations that influenced the officers' conduct are unrelated to race. There is no need to

consider defendants' alternative qualified immunity argument since plaintiffs have failed to establish the Equal Protection claim. We grant summary judgment in favor of defendants on plaintiffs' equal protection claim.

### E. *Section 1983 Claim Based on First Amendment*

"[A]n individual has a viable claim against the government when he is able to prove that the government took action against him in retaliation for his exercise of First Amendment rights." *Anderson v. Davila*, 125 F.3d 148, 160 (3d Cir.1997). "[A]n otherwise legitimate and constitutional act can become unconstitutional when an individual demonstrates that it was undertaken in retaliation for his exercise of First Amendment speech." *Id.*, 125 F.3d at 161. Such a claim may be brought under Section 1983. *See generally Anderson.* To prevail on the retaliation claim, plaintiffs must prove that (1) Smith engaged in protected activity; (2) the government responded with retaliation; and (3) Smith's protected activity was the cause of the government's retaliation. *Id.*

[62] It is undisputed that prior to July 10, 1999, Smith had lodged several complaints against members of Troop L and that some of the defendants knew of these complaints prior to July 10, 1999. Plaintiffs argue that this knowledge, coupled with the way that the officers handled the events of July 10–11, 1999, supports the inference that Smith's complaints [37] substantially motivated defendants to engage in retaliation against him.

We disagree. It is true that the fact that governmental conduct follows protected activity may, in itself, be sufficient to show retaliation. *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279–81 (3d Cir.2000). However, this is not the case where the temporal relationship is "unusually suggestive" of retaliation. *See generally Farrell*, 206 F.3d at 280. Looking then, as the Third Circuit has directed us, to whether there is other evidence that suffices to establish the causal connection, we find that the circumstances of this case do not indicate that defendants acted in retaliation. Plaintiffs have offered no evidence, other than the fact that Smith had made complaints against the police of which the police were aware, to prove that this otherwise legitimate governmental act of responding to a complaint made by Smith's neighbor was undertaken in retaliation against Smith for his prior complaints against the police. The officers' decision to approach the front door and then, when they received no answer, to move to the back of the house was routine. Defendants heightened their approach only once they believed that a weapon was directed at them and their lives were in

---

**37.** Both parties appear to agree that Smith's complaining about police conduct was constitutionally protected. Defendants argue, however, that judgment should be entered in defendants' favor because (1) plaintiffs cannot point to any protected activity that Smith engaged in on July 10, 1999 and (2) to the extent that plaintiffs rely on incidents between Smith and the state police in 1991 and 1998, "those events are too distant and attenuated to be relevant and are also barred by the statute of limitations." (Defs.' Renewed and Amended Mot. for Sum. Judg. at 18 fn. 6.) Without delving unnecessarily into the issue of whether the statute of limitations bars this claim, we reject the suggestion that Smith's complaints were prima facie too remote from the events of July 10–11, 1999 to serve as the basis for a retaliation claim. There is no set point after which the protected event automatically becomes irrelevant. Temporal proximity between the protected activity and the alleged retaliation is a factor to consider along with any other circumstances tending to show retaliation. *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279–81 (3d Cir. 2000).

danger; plaintiffs have offered no evidence to refute this inference. We find that plaintiffs have failed to establish a causal connection between the complaints by Smith and the activities of July 10–11, 1999; they have not showed that defendants acted in retaliation. There is no need to consider defendants' alternative qualified immunity argument. We grant summary judgment in favor of defendants on plaintiffs' First Amendment claim.

### F. State Law Claims

A district court may decline to exercise jurisdiction over a state law claim if the court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). The Supreme Court has indicated that "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United ed Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Since we have granted summary judgment on all of the federal claims, we decline to exercise jurisdiction over the supplemental state law claims, including plaintiffs' wrongful death claim, survival action and intentional infliction of emotional distress claim.

### V. CONCLUSION

For all of the foregoing reasons, defendants' motion for summary judgment is granted to the extent that all federal claims will be dismissed with prejudice. We have not reached any of defendants' qualified immunity arguments, but had we done so, we would have granted qualified immunity on each of plaintiffs' federal claims.

An appropriate order follows.

### ORDER

AND NOW, this 11th day of January, 2002, upon consideration of Defendants' Renewed and Amended Motion for Summary Judgment, filed on October, 26, 2001; Plaintiffs' Opposition to Defendants' Renewed and Amended Motion for Summary Judgment, filed on November 9, 2001; and Defendants' Reply Brief to Plaintiffs' Response to Defendants' Summary Judgment Motion, filed on November 26, 2001, it is hereby ORDERED, consistent with the foregoing Opinion, that:

xv. Defendants' Motion for Summary Judgment is **GRANTED**;

xvi. Defendants' federal claims are **DISMISSED WITH PREJUDICE**, including:

i. Defendants' retaliation claim under the First Amendment of the United States Constitution;

ii. Defendants' excessive force claim under the Fourth Amendment of the United States Constitution;

iii. Defendants' unreasonable searches and seizures claim under the Fourth Amendment of the United States Constitution;

iv. Defendants' malicious prosecution claim under the Fourth Amendment of the United States Constitution;

v. Defendants' substantive due process claims under the Fourteenth Amendment of the United States Constitution;

vi. Defendants' abuse of process claim under the Fourteenth Amendment of the United States Constitution; and

vii. Defendants' equal protection claim under the Fourteenth Amendment of the United States Constitution;

xvii. All of Plaintiffs' state law claims are **DISMISSED WITHOUT PREJUDICE** to

Plaintiffs' right to pursue these claims in state court; and

xviii. This case is **CLOSED.**